BARNETT OIL & GAS CO. v. NEW MARTINSVILLE OIL CO.

(District Court, N. D. West Virginia.   December 20, 1918.)

No. 43.

1. CONTRACTS ☞94(5)—FRAUDULENT REPRESENTATIONS—PERSONS LIABLE.
     The law will not permit one to defend his making false and fraudulent representations to secure a contract on the ground that his dupe ought not to have trusted him and believed his falsehoods.

2. CONTRACTS ☞95(1)—VALIDITY OF CONSENT—DURESS.
     What constitutes duress, under the more liberal modern views, depends upon the particular facts, and in each case the court, in the exercise of a sound discretion, must endeavor to determine the question in accord with right and justice.

3. MINES AND MINERALS ☞64—CONTRACTS INDUCED BY FRAUD—RATIFICATION —DURESS.
     A corporation, induced by fraudulent representations to contract for purchase of an oil lease at several times its value, and which in good faith made the same representations to purchasers of its stock, held not estopped by ratification, because it failed to repudiate the contract immediately on discovering the fraud, but made further payments, until by other purchases it brought its stock to the value represented and avoided insolvency, but to have acted under such duress as to render it inequitable to permit the seller to enforce the contract for more than the actual value of the property.

In Equity.   Suit by the Barnett Oil & Gas Company against the New Martinsville Oil Company.   Decree for complainant.

John A. Howard and Jas. M. Ritz, both of Wheeling, W. Va., for plaintiff.

Robert McV. Drane, of Piedmont, W. Va., Osman E. Swartz, of Fairmont, W. Va., and E. Bryan Templeman, of Clarksburg, W. Va., for defendant.

DAYTON, District Judge.   This case has been submitted for final hearing after all the evidence has been taken in open court and time given counsel to file briefs.   Such briefs have been filed, and they, as well as the ones filed in relation to the preliminary motions heretofore made in the cause, have been most carefully considered.   I have already filed two memorandum opinions as to the disposition of these preliminary motions.

The contention arising in this case grows out of the sale made by the defendant to the plaintiff of an oil lease in Wetzel county, this state, known as the Morgan lease.   The plaintiff claims that this sale was effected by and through the effort of W. T. Robinson.   Plaintiff contends he was acting as the agent for defendant in effecting this sale.   Defendant denies this agency.   Plaintiff further contends that Robinson induced Barnett, acting as agent for and in its behalf, to make the contract of purchase by gross fraud and misrepresentation.   The defendant denies this, and in addition insists that, if fraudulent and false misrepresentations were made by Robinson in securing the contract, afterwards, after it had been fully informed of such,

the plaintiff ratified it, secured additional contracts, in which the times of payment we're changed and extended, instead of repudiating the contract promptly on discovery of its condition and value, and the falsity of Robinson's representations of it, whereby it is estopped from further remedy on account of such fraud and misrepresentation, if any there were.

There is no question as to the change of the terms and conditions of the contract after the plaintiff was informed of the true oil and gas yielding production from the wells situate on the lease. In fact, the whole character of the original contract was changed. This original contract bore date February 29, 1916. By its terms Barnett undertook for $350,000 to purchase all the capital stock of the defendant company, for which he was to pay $10,000 March 4, 1916, and $10,000 on Saturday of each week thereafter until the whole purchase price was paid. If a default of seven days was made in any payment, he was to forfeit all previous payments made to the New Martinsville Oil Company, and the stock certificates for the stock were to be returned to its stockholders, from whom they had been obtained. The stock certificates of defendant, indorsed in blank, so as to properly transfer them, were to be delivered to Robinson as trustee for the New Martinsville Oil Company, and he was to deposit them in the West Virginia Bank at Clarksburg in escrow, and in his name, to be turned over to Barnett only when all payments had been made. In the meantime, while the management and control of the property was to pass immediately to Barnett, no oil produced by the property was to be sold, except by consent, and if Barnett defaulted in any payments this oil was to belong and go to the New Martinsville Company, as well as all sums that had been paid. This contract was executed solely by J. W. Barnett, W. T. Robinson and A. R. Stallings.

On March 7th following it was modified by an agreement, signed only by the same three parties, to the effect that if Robinson and Stallings could not secure all the stock, but could deliver more than 60 per cent. of it, Barnett was to take and pay for the same at a proportionate rate of $350,000 for the whole. Barnett paid, under this contract, a total sum of $25,000. That Barnett was in fact acting for the plaintiff, the Barnett Oil & Gas Company, is not denied. He, C. W. Barnett, and L. M. Stephens were the leading organizers of that company, and it seems, immediately after this contract was signed, proceeded to advertise, in connection with Clark, a New York broker, its stock for sale, asserting and setting forth that it owned, among other property, this Morgan lease, having a settled daily production of 255 barrels of oil per day, and did sell enough thereof to realize the sum of $25,000, which was paid as above stated upon this contract.

It is claimed by plaintiff that these representations were made by Stephens and Clark, the broker, in good faith, upon the representations made by Robinson to Barnett and Stephens; that upon consultation with counsel they discovered and realized that they, under the contract, had in fact no direct right nor title whatever to this Morgan lease; that their purchase was solely that of the stock of the New

Martinsville corporation, and that by failure to meet the weekly payments this stock could be withdrawn and their payments forfeited; that for this to occur would involve them in disgrace, financial embarrassment, and possibly subject them to criminal prosecution. Howard, their attorney, undertook to relieve this grave and serious condition. He secured a meeting of the stockholders to be had on April 24, 1916, at which time an agreement was arrived at whereby the property, real and personal, of the defendant, instead of its stock, was to be transferred and sold to the plaintiff corporation, and this agreement was subsequently incorporated in a contract of sale under date of May 2, 1916, executed by the defendant corporation to the plaintiff, and secured by a deed of trust the same day upon the property, executed by the plaintiff company to Dyer, trustee. By these instruments, after allowing credits for payments made, and after assuming a balance of $34,600 due to Robinson and Stallings from the defendant for their services in making the sale, and a cash payment of over $40,000 was made, a balance of $255,400 was ascertained to be due from plaintiff and was secured by the deed of trust.

In the meantime the operation of the wells had been under the control of Culp as manager of the plaintiff, but the oil produced had been run into the pipe lines and the run tickets had been sent to Mc-Farlane, the defendant's treasurer. Culp had reported to Barnett that he had been deceived in the producing capacity of the wells, but to what extent had not been set forth, and Barnett about this time disposed of his interests in plaintiff company, resigned his office of president and his directorship, and no investigation of the extent of the deception was made by him. The run tickets were asked for, at or about the time of this May meeting, of McFarlane, who promised to send them to plaintiff's attorney and subsequently he did send them. In September following still another meeting between representatives of the plaintiff and officers and stockholders of defendant was held at Cumberland, Md. At this meeting, it seems, the failure in production was quite vigorously discussed, and demands made for rescission or readjustment of the contract. The defendant refused any other settlement than one involving extension of time and modification of the number and amounts of payment, and the result was the release of the old deed of trust, the execution of a new one to secure a balance, $185,400, upon this Morgan lease and other property owned by plaintiff. This trust was executed October 1, 1916. It was expressly provided that none of the wells should be shot, except by consent of defendant.

In June (apparently the 19th), 1917, a conference was had between the attorneys and some of the officers of these companies, the result of which was that on the 22d a check was sent by plaintiff's treasurer for $5,000 to the attorney for the defendant, with a letter setting forth what its writer understood had been agreed upon, among other things that plaintiff should have permission to shoot any of the wells in such manner as good practice warranted, and was to be granted permission to surrender any of the Culp leases (covered by the deed of trust), other than the Morgan one, unproductive and causing outlay in the payment of rentals, and in case the debt in full was paid on or be-

fore October 1, 1917, a deduction of $40,000 of the contract price should be made. This proposition was rejected, and the defendant proceeded at once to cause advertisement of sale under the deed of trust to be made.

Thereupon this bill was filed, and upon notice and hearing had Circuit Judge Pritchard awarded a restraining order, afterwards continued by my order. The bill in effect charges that during all these 15 months from March, 1916, to June, 1917, when these proceedings were had, the plaintiff's officers were laboring under the oppressive fear of the disastrous results that would arise from litigation and exposure of the untrue representations made by them, in the sale of stock, solely by reason of their faith in Robinson and his misrepresentations; that the defendant and its officers knew this, and took advantage of it to enforce a fraudulently procured and grossly unjust and outrageous contract; that the wells never did have a settled production of 255 barrels per day, or more than a third of it; that not until November, 1916, did any opportunity offer for any relief from this embarrassing condition; that then certain of its officers, by purchase with their own funds, secured and transferred to their company additional properties which turned out to be valuable, and, at the time of filing the bill in July, 1917, had been so productive as to put the company upon a sound and substantial basis, so that it could, without fear, assert its determination to resist the defendant's oppressive demands.

The first question that arises is: Was Robinson acting as agent for the defendant company in this sale, and are it and its stockholders legally bound by his acts in that regard?

I cannot doubt it. It is not denied that these stockholders, with a very few exceptions, ratified the provision of the first contract that constituted him their trustee to receive from them their stock and place it in escrow in the bank at Clarksburg. They recognized their obligation to pay him and Stallings over $40,000 for their services in this behalf, and provided for its payment out of the purchase price that was to be paid for the property. They at no time, so far as the evidence discloses, during the months prior to the advertisement of the sale, denied his right to make on their behalf the sale, but, on the contrary, strenuously insisted upon its enforcement.

The second question, then, is: Did he make the false representations charged in the bill as to the settled production of the property, which were relied on and constituted the moving cause of the contract's execution?

As to this I am not in doubt. It is fully testified to by Barnett, who at the time he testified was no longer concerned as stockholder in the Barnett Company. He testifies that, prior to the agreement, Robinson furnished a detailed written statement purporting to show the condition of each well on the lease and its producing capacity; that the aggregate of all exceeded 350 barrels daily; that some of this production was initial or "flush," and some what might be considered "settled," or fairly so; and that from this statement they figured that the fixed daily production could be reasonably estimated at 255 barrels, and that upon this basis the contract was made. This

paper was shown to Stephens, who has fully corroborated Barnett's evidence as to its substantial contents. Its unfortunate loss and the failure to produce it has been reasonably accounted for. There is no single word of contradiction of this evidence. I have heard these men testify. I have noted their demeanor on the stand. The impression of counsel for defendant that their evidence, on its face, was incredible, "a cock and bull story," was entirely foreign to me, as I saw them on the stand and heard them testify. On the contrary, they seemed to me to be fair-minded, frank, and sincere in their statements, to the extent that I felt compelled to concede their entire truthfulness. This conviction, after earnest reflection, is confirmed rather than weakened, for two reasons: First, because, as I have said, no word of denial was made by defendant. Robinson still lives. His evidence was procurable. It seems clear, if the defendant desired this evidence to be discredited, at least a basis therefor could have been secured by a denial of it by Robinson.

[1] But another thought arises in this connection. What possible motive could actuate two business men, well known in their respective communities, to pay or agree to pay so large a sum for a lease on some 200 acres, if it were their purpose to promote a "wild-cat" oil company stock scheme? What need had these men, if this was their purpose, to go outside the leases they already had in Wirt county, or why not buy up any number of larger leases, where wells had been drilled and exhausted, but whose production could as easily have been misrepresented? Nor to my mind does it discredit these men that they believed Robinson's representations and did not make a preliminary and exhaustive investigation before contracting. It is a common saying that honest men are generally the most credulous. It is common knowledge that great competition has existed here in our oil fields in securing productive oil leases. Such properties do not go begging for purchasers, and contracts for their purchase are generally made quickly. In this case, Barnett was a merchant, while Robinson was an expert oil operator. Barnett had been interested with Robinson in some other leases. It was not unnatural that Robinson's statements as to the productive value of this lease should be controlling, because he had been one of the original organizers of the New Martinsville Company, which owned only this one lease, and he had sold out, just before, his interest to Dyer and McFarlane at proportionately the excessive price he was seeking to secure Barnett to pay for the property. It may be, as suggested by counsel, that, in order to square himself with Dyer and McFarlane for the imposition upon them, he was seeking a greater imposition, for a $40,000 consideration added, upon Barnett and his company; but Barnett could not know this, and certain it is the law does not suffer another to defend his making fraudulent and false representations to secure a contract on the ground that his dupe ought not to have trusted him and believed his falsehoods.

[2, 3] But the third question that arises in this case, whether the ratification of this contract and purchase, after full knowledge of the fraud that had been perpetrated was disclosed to and known by plaintiff, estops it from relief in the premises, is far more perplexing

and difficult of determination. It goes without saying that the general rule has been established by an enormous number of cases that it is incumbent upon the deceived party in a contract procured by fraud and misrepresentation, upon ascertaining the truth, to promptly repudiate and seek its rescission. It is true, also, that this rule is subject to limitation and exception in rare instances. The counsel on both sides in their very able briefs have discussed these legal propositions and cited many authorities pro and con. I have made a long and weary examination of these authorities and an independent investigation on my own part, to ascertain whether under the decisions the facts here warrant any modification of this general rule. The grounds sought for such modification, as claimed by the plaintiff, may be summarized as follows: (a) That the misrepresentations were so great as to secure a wholly unjust and unconscionable contract; (b) that, being misled by these false and fraudulent representations, the officers and principal stockholders had unwittingly repeated them, for the purpose of securing stock subscriptions, and were in consequence in such condition as to suffer greatly in honor, business reputation, and to the extent of possible criminal prosecution; (c) that litigation at the time and before opportunity to retrieve by additional acquirement of property making the company solvent meant its entire financial destruction and ruin; (d) that defendant and its officers, knowing this duress and strain under which the plaintiff and its officers were laboring, took advantage thereof to enforce the contract knowing it to be unreasonable, unjust, and oppressive.

On this subject of duress, in U. S. v. Huckabee, 16 Wall. 431, 21 L. Ed. 457, it is said:

"Duress, it must be admitted, is a good defense to a deed, or any other written obligation, if it be proved that the instrument was procured by such means; nor is it necessary to show, in order to establish such a defense, that actual violence was used, because consent is the very essence of a contract, and if there be compulsion there is no binding consent, and it is well settled that moral compulsion, such as that produced by threats to take life or inflict great bodily harm, as well as that produced by imprisonment, is sufficient in legal contemplation to destroy free agency, without which there can be no contract, because in that state of the case there is no consent. Unlawful duress is a good defense to a contract, if it includes such degree of constraint or danger, either actually inflicted or threatened and impending, as is sufficient in apprehension or severity to overcome the mind and will of a person of ordinary firmness."

This ruling of the Supreme Court would seem to justify the statement made in the note to Hatter v. Greenlee, 26 Am. Dec. 374, that—

"This branch of the law may be considered to be in or to have just passed through a state of transition, the old and harsh doctrines of the common law of the time of Lord Coke, on the subject, everywhere giving way to more liberal views; more especially is this so upon this side of the Atlantic."

In another of these very admirable notes (covering 18 closely printed pages) to the case of Mayor of Baltimore v. Lefferman, 45 Am. Dec. 153, the subject is exhaustively treated, a vast number of authorities are cited, and an attempt is made to define wherein and upon what conditions the "more liberal views" held by the courts "upon this side of the Atlantic" are applicable. The result to my mind leads to

the very familiar conclusion that such application must, in the final analysis, depend upon the facts of each case, and that the chancellor or judge must be controlled by a sound discretion in each; that no hard and fast rule can be established; the effort must be to see the right and justice in the case and do it.

In this note it is said, upon authority of Moses v. Macfarlane, 2 Burr. 1009:

"The action for money had and received, which is the form in which a party must sue to recover back a payment which he has made by compulsion, is an equitable action, and it proceeds on equitable principles. It does not lie, therefore, unless the payment was made under circumstances rendering it inequitable and unjust to retain the money paid."

If this were the extent of the law's limitation, there would be little trouble in determining this case, for I think it is plainly apparent that this contract, originally, was procured to be executed by the fraudulent and false representations of Robinson, acting as agent for the defendant corporation and its stockholders, and for which, therefore, they should be held bound; that it was a grossly inequitable and unjust contract; and that plaintiff and its officers were induced, by the compelling fear of financial ruin to the company, loss of business standing and reputation to its officers and principal stockholders, and their possible criminal prosecution, to execute the after contracts ratifying it and make the further payments they made. But the writer goes on and says:

"There must be some culpability on the part of the defendant to enable the plaintiff to recover back money paid on the ground that the payment was involuntary. If the party receiving the payment acts in the supposed exercise of a legal right, using no coercion or unlawful measures to compel payment, but the other party pays the money under the compulsion of a third person, for whose acts the payee is in no way responsible, the action will not lie."

How shall we apply this limitation here? It cannot be said that the defendant corporation, its officers, or its stockholders were directly threatening either loss financially or of reputation or criminal prosecution. Nor were the persons to whom the stock of plaintiff had been sold. They were ignorant of the situation, and it was vital, it seemed to the plaintiff's officers, that they should remain so until they were able to change conditions. The situation in brief may be stated thus: While not threatening in any way these men with loss or prosecution, the defendant, through its agent, was responsible for the compelling fear that the purchasers of plaintiff's stock would cause it to suffer great loss, and its officers to be prosecuted, and instead of aiding them to escape from such embarrassing position, on the contrary, in a sense at least, used it as a means of securing the ratification of their unjust and oppressive contract.

Does the liberality of the law, in transition from the harsh rules laid down by the common law as enunciated by Lord Coke, go far enough in the application of its doctrine of duress to apply to such condition of affairs? I have found no decision exactly in point, and it would be entirely burdensome to attempt a discussion of the multitude of cases relating to the general principles. In addition to the many cit-

ed in the two notes I have referred to, others will be found cited in the notes to Adams v. Irving Nat. Bank, 6 L. R. A. 491, and to Shattuck v. Watson, 7 L. R. A. 551. An interesting case from Virginia will be found in Pilson, Trustee, v. Bushong, 29 Grat. 229. See, also, 1 Story, Eq. Jur. § 239.

Pomeroy in his Equity Jurisprudence (2d Ed.) § 948, says:

"Whenever one person is in the power of another, so that a free exercise of his judgment and will would be impossible, or even difficult, and whenever a person is in pecuniary necessity and distress, so that he would be likely to make an undue sacrifice, and advantage is taken of such condition to obtain from him a conveyance or contract which is unfair, made upon an inadequate consideration, and the like, even though there be no actual duress or threats, equity may relieve defensively or affirmatively."

A long and earnest study of this case has led me to doubt whether the law relating to duress relied upon by counsel can be applicable, except to a limited extent, in aid of another ground for relief now to be considered; and this for the reason that its principles seem to be confined to personal transactions, and not to corporate control and management. Be this as it may, I am constrained to the conclusion that the contract price for this property was an exorbitant one, possibly three times what it was worth, and it was secured to be paid by the false and fraudulent representations of defendant's agent; that its enforcement would be unjust and inequitable; that the ratifications of this contract were made by plaintiff and its officers when they were "in pecuniary necessity and distress," driven thereby "to make an undue sacrifice," and that defendant, knowing this condition, took an unfair advantage to secure them; that in consequence the plaintiff corporation, on its own behalf and on behalf of its innocent stockholders, who were no parties to the transaction, is entitled to some relief in this court of equity, under this principle set forth by Pomeroy and the cases cited by him and by many others.

What shall be the measure of this relief? It is not denied that the lease had some intrinsic value, and that the personal property conveyed in connection with it also had value, all of which plaintiff has secured under the contract. Whether such value could now be ascertained accurately may be questioned. If it could, it would be beyond the power of a court of equity to attempt to make a new contract for the parties, based upon the value of the property. I think it is only within its power to abate the purchase price to the extent that the defendant sold what it did not have, because it did not exist; but such abatement must be at the rate of value the parties contracted to pay for it, if it had existed. A very serious trouble here arises because of the anomalous character of the property. Oil and gas, in a sense, are sui generis. When dormant in mother earth, they are realty. When produced on top the ground, they become personalty. Archer, Oil and Gas, 558, and numerous cases there cited.

It is impossible to tell how much of this peculiar kind of realty exists under a given tract of land until by the drill and pump the quantity in personalty has been secured above ground. It is well settled that a failure of quantity of land sold is subject to abatement of purchase price any time, at least, before the purchase price per acre is

fully paid. It seems to me that this principle of abatement can well be applied here. It cannot be strictly accurate and satisfactory, because it cannot be applied to the number of acres of surface land embraced in the lease. It must be based here, it seems to me, upon the 255 barrels of settled production which Robinson represented it to be making. Here, too, complication springs in determining whether it had any "settled" production at all, as it is in evidence that its production ran down in less than two years to 3 barrels per day. As to this, however, I think Barnett took the risk of this occurring.

I therefore have reached this conclusion: First—That, if the defendant company elects, by answer filed within 10 days, to have the contract rescinded rather than the contract price abated, I will direct a decree to that effect and refer the cause to a master, to ascertain and report an accounting between the companies as to the oil obtained by the plaintiff, the money paid to and received by the defendant, and other matters arising as to the use and consumption of the personal property involved. If the defendant shall not so elect to rescind the contract, I will enter a decree abating the purchase price, basing it upon the difference between the misrepresented 255 barrel daily production and what was the actual daily production at the time the first contract was made. If parties cannot agree what this actual production was on that date, I will direct a master to ascertain the daily production for each of the 30 days just preceding the date of this contract, and ascertain the average for such number of days, and fix it as the actual daily production. This may be considered in a measure an arbitrary basis, but it is as nearly equitable as, I conceive, can be arrived at under the existing conditions.