Rafael Rivera Rochig, demandante y apelante, *v.* The Manufacturers Life Insurance Company, demandada y apelada.

No. 3403.—*Visto:* Febrero 3, 1925. *Resuelto:* Mayo 8, 1925.

1. Contratos—Requisitos y Validez—Validez del Consentimiento—Intimidación.—Para que exista intimidación es esential que se amenace con un mal y que éste sea injusto.

2. Seguros—Cancelación, Entrega, Abandono y Rescisión de la Póliza—Ratificación de Renuncia.—El hecho de cobrarse un cheque, precio de la cancelación de una póliza por renuncia hecha de los derechos a la misma, (después de haberse consultado un abogado), constituye una ratificación de dicha renuncia (*dictum*). .

SENTENCIA de *R. Díaz Cintrón*, J. (Ponce), declarando sin lugar la demanda, sin costas. *Confirmada.*

*Eduardo Flores Colón*, abogado del apelante; *Daniel F. Kelley* y *Alberto S. Poventud*, abogados de la apelada.

EL JUEZ ASOCIADO SEÑOR ALDREY, emitió la opinión del tribunal.

Julio F. Rivera Rochig solicitó el 9 de junio de 1923 de The Manufacturers Life Insurance Co. un seguro sobre su vida y el 9 de julio del mismo año le fué expedida la póliza correspondiente por $18,000. El 30 de octubre del mismo año murió el asegurado habiendo dispuesto antes que fuera pagada la póliza a su hermano Rafael Rivera Rochig, quien el 12 del mes siguiente relevó bajo su firma a la compañía aseguradora de toda responsabilidad por dicha póliza y se la entregó en consideración a la devolución por dicha compañía de los $560.60 de la prima pagada por ella, haciendo constar que hacía tal transacción de su propia y libre voluntad por la razón de creer que su hermano Julio F. Rivera no se hallaba en buen estado de salud cuando hizo la solicitud para el seguro y que la compañía aseguradora estaría justificada al rehusar el pago del importe de la póliza. Los $560.60 fueron entregados a Rafael Rivera Rochig en un cheque que cobró dos días después.

A los pocos días de esto Rafael Rivera Rochig demandó a The Manufacturers Life Insurance Co. para que le pagase la cantidad del seguro de su hermano alegando que el traspaso que de ella hizo a la compañía aseguradora fué obtenido por un agente de la misma valiéndose de engaños y de falsas acusaciones, amenazándolo con persecusiones criminales y alegando que tal póliza era nula, por lo que ante esas amenazas y ante la pena de que desenterraran el cadáver de su hermano se vió forzado a entregar la póliza.

Habiéndose opuesto la demandada a esa reclamación, se celebró el juicio y recayó sentencia declarando sin lugar la demanda, fallo que ha sido apelado por el demandante.

Aunque en el juicio se presentó evidencia sobre si cuando Julio F. Rivera Rochig solicitó la póliza estaba en buena salud o padeciendo de tuberculosis pulmonar, apareciendo también de ella que poco tiempo antes ganaba el asegurado un jornal de siete dólares semanales y de que un mes antes tomó otra póliza de seguro por $15,000, podemos prescindir de dicha prueba porque la cuestión fundamental en este pleito es si la renuncia que el apelante hizo de sus derechos a dicha póliza fué obtenida por intimidación de los agentes de la compañía aseguradora.

Con respecto a ese particular la prueba del demandante consistió en su declaración, en la de su hermano Ramón Rivera y en la de la esposa de éste Hipólita Bigas. El demandante, que es de 27 años y tiene una relojería, declaró que el día 11 de noviembre de 1923 se presentó en su casa don Angel M. Mayoral, cuñado de la esposa de su hermano Ramón y agente de la demandada, y estando presente su dicho hermano y la madre de ambos le pidió que le entregara la expresada póliza diciéndole que había que cancelarla porque si no iban a ir todos ellos a la cárcel y desenterrarían el cadáver de su hermano Julio: que al día siguiente volvió a su casa Mayoral acompañado de un americano y del Sr. Font y le repitieron lo que le había dicho antes Mayoral, que aquello no era legal, y le hicieron firmar renunciando su derecho a la póliza pero no se ocupó de leer lo que firmó: que ese mismo día fué a la hora de almuerzo al hotel "Meliá" y pidió que le dejaran leer lo que había firmado y se lo dieron a leer y le entregaron el cheque devolviéndole la prima pagada del seguro: que al día siguiente, 13, habló con el abogado que le defiende en este pleito: que el 14 fué cobrado el cheque y que él no tenía que tener miedo a nada. Ramona Rivera e Hipólita Bigas dijeron que estaban levantándose de la cama el domingo por la mañana cuando llegó Mayoral con el Sr. Font y el americano Mr. Young y oyeron desde su cuarto una discusión acalorada exigiendo a su hermano la entrega de la póliza diciendo que

su hermano Julio estaba enfermo cuando se aseguró, que iban a desenterrar su cadáver y a meterlos a todos en la cárcel por ·lo que su hermano Rafael entregó la póliza y firmó un documento sin saber lo que decía.

Por la parte demandada declaró don Angel M. Mayoral, quien manifestó que con motivo de la póliza en cuestión estuvo un domingo por la tarde en la casa de Rafael Rivera y después de hacerle varias explicaciones en cuanto al concepto que la compañía tenía del riesgo de dicha póliza, porque había averiguado o tenía dudas en cuanto a que la vida del difunto Julio no era de primera clase y que se habían hecho ciertas ocultaciones en cuanto al verdadero estado de salud de él que daban lugar a que la compañía tuviera derecho a cancelar la póliza, por esas reflexiones Rafael Rivera le entregó la póliza para su cancelación ofreciéndole el declarante devolverle la prima del seguro al día siguiente: que esa tarde nadie lo acompañó a esa entrevista: que por la noche llevó la póliza a Mr. Young, que es representante de la compañía, y con él fué al día siguiente por la mañana a la casa de Rafael Rivera, después de haber sido escrita en maquinilla la cancelación de la póliza al dorso de ella, se leyó lo escrito a Rafael Rivera y le dijo que él le respondía del pago de la prima y que a la hora del almuerzo fuera a buscar el cheque por la misma al hotel Meliá: que don Eliseo Font, gerente de la compañía, nunca fué con el declarante a la casa de Rafael Rivera: que el declarante nunca amenazó al demandante: que mencionó lo de desenterrar el cadáver de Julio como una de las cosas posibles que podía hacer la compañía para probar el mal estado de la salud de Julio: que cuando fué con Mr. Young se limitaron solamente a leer a Rivera lo que se había escrito en la póliza y a decirle que fuera al hotel Meliá a buscar el cheque. Mr. Wm. Edwin Young es agente de la demandada y dijo que fué con Mayoral a la casa de Rafael Rivera: que allí no hubo discusión, intimidación ni amenazas pues lo que pasó fué que él o Mayoral mostró la póliza que había es-

tado en su posesión desde la noche anterior y Mayoral le hizo ciertas explicaciones a Rivera en pocas palabras que parecían tener su completa aceptación, y sin discusión firmó el documento después de haberle sido leído por Mayoral: que el Sr. Font no estaba allí y por eso no pudieron entregarle el cheque a Rivera pero le fué dado después en el hotel "Meliá," habiendo leído antes Rafael Rivera la renuncia de la póliza y habiendo dicho que estaba conforme con ella. Don Eliseo Font declaró que nunca ha estado en la casa de Rafael Rivera.

[1, 2] Aunque en vista de que la evidencia que presentaron las partes es contradictoria en muchos extremos, entre ellos en si el Sr. Font estaba en la entrevista en que fué firmada la cancelación de la póliza: si la cancelación fué leída antes de ser firmada: si en esa ocasión fueron dichas al demandante las palabras que él alega: respecto a cuáles fueron esas palabras; y en vista también de que dada la sentencia recaída en el pleito podríamos concluir que la corte inferior dió crédito a la prueba de la demandada y por tanto que el Sr. Mayoral nada dijo al apelante que revistiese los caracteres de intimidación para conseguir que la póliza le fuera entregada para su cancelación y que por todo ello la sentencia apelada debería ser confirmada sin más argumentación, sin embargo, preferimos fundar nuestra decisión resolviendo si las palabras que el demandante atribuye al agente de la demandada Sr. Mayoral son de intimidación y vician de nulidad el consentimiento prestado por el demandante.

Dispone el artículo 1232 del Código Civil que será nulo el consentimiento prestado por error, violencia, intimidación o dolo; y el 1234 declara que hay intimidación cuando se inspira a uno de los contratantes el temor racional y fundado de sufrir un mal inminente en su persona o bienes, o en la persona o bienes de su cónyuge, descendientes o ascendientes; y que para calificarse la intimidación debe atenderse a la edad, al sexo y a la condición de la persona.

Comentando esos preceptos el Sr. Manresa en sus Comentarios al Código Civil (Vol. 8, p. 618, ed. 1901), dice lo siguiente: "Esencial es también que se amenace con un mal, y en esta sola palabra nos detenemos, sin pasar a los adjetivos que la siguen, porque no entendiendo el legislador como mal aquello que el mismo derecho ampara o impone, deducimos de ahí la consecuencia importante de que el mal ha de ser injusto y de que no intimida quien se limita a invocar su derecho, sin abusar del mismo."

Estamos conformes con esa interpretación de la ley y de acuerdo con ella y teniendo en cuenta el sexo, edad y capacidad del demandante, tenemos que concluir que aunque el Sr. Mayoral hubiera dicho al demandante, como éste declaró, que había que cancelar la póliza porque si no todos iban a ir a la cárcel y desenterrarían el çadáver de su hermano porque aquello no era legal, tales palabras no son constitutivas de intimidación porque eran la expresión de lo que podría hacer la demandada en el ejercicio de su derecho para demostrar que la póliza no era legal, y por tanto no constituyen un mal injusto. Además el haber sido cobrado el cheque, precio de la cancelación, dos días después y cuando ya el demandado había consultado un abogado constituye una ratificación de su renuncia.

*Por los motivos expuestos lá sentencia apelada debe ser confirmada.*