José R. Rivera, demandante, *v.* Banco Industrial de Puerto Rico, demandado y apelante; Julio C. García, interventor y apelado.

No. 6215.—*Sometido:* Enero 22, 1935. *Resuelto:* Marzo 20, 1936.

*C. Santana Becerra,* abogado del apelante; *Antonio R. Barceló Jr.,* abogado del apelado.

El Juez Asociado Señor Hutchison, emitió la opinión del tribunal.

██ García compareció como interventor en un pleito iniciado por Rivera contra el Banco Industrial de Puerto Rico y obtuvo sentencia contra este último por la suma de $750, más intereses legales a partir del 18 de noviembre de 1930. El único error señalado es que la corte de distrito erró al declarar sin lugar una excepción previa de falta de hechos para determinar una causa de acción. La parte pertinente de la demanda de intervención lee así:

"3.—Que allá para abril de 1929 el interventor tenía en poder del Banco Industrial de Puerto Rico la suma de $925 de la cual cantidad el Banco Industrial tomó la suma de $175 para abonarle a un pagaré que con la firma del aquí interventor y de don Juan Nogueras aparecía vencido en la cartera de dicho banco.

"4.—Que el remanente de dicha suma, o sea la cantidad de $750 la utilizó y aplicó dicho banco al reembolso de ciertos gastos que había efectuado el Banco Industrial en la reparación de una casa radicada en la calle de las Flores, número 29 de dicha calle, que había sido adquirida por dicho banco en pública subasta en un procedimiento judicial seguido ante esta corte por Esteban Alvarez Garriga contra José Dolores Cruz, caso civil número 7575 sobre ejecución de hipoteca, así como también dicha suma de $750 fué utilizada por el banco para reembolsarse los gastos judiciales, costas y honorarios de abogado inclusive que había originado el referido pleito número 7575.

"5.—Alega el interventor que el presidente del Banco Industrial lo llamó a las oficinas donde está instalado dicho banco para comunicarle que la dirección del banco había acordado proceder a utilizar la suma de $925 perteneciente al interventor, en la forma en que se deja expresada y que, en cumplimiento de tal acuerdo, dicha cantidad de $925 había sido aplicada en la forma antes expresada; a lo que el interventor se opuso por creerlo injusto e ilegal, y entonces el presidente del Banco Industrial hizo saber al interventor que si no daba su conformidad para que la suma de $925 fuere aplicada de la manera antes dicha, el banco procedería inmediatamente a cobrar por la vía judicial y mediante embargos, fuerte suma de dinero que el interventor estaba adeudando al Banco Industrial con la garantía solidaria de amigos y relacionados suyos en negocios, que

le habían facilitado el uso de su firma y crédito; y alega el interventor que ante la amenaza del señor presidente del banco y la coacción ejercitada por éste contra el interventor y ante el temor de que de no allanarse a los deseos de la dirección del banco, tanto el interventor como sus amigos recibirían serios perjuicios en su crédito y en su prestigio si se procedía contra ellos por la vía judicial al cobro de las obligaciones vencidas y pendientes en el banco, y alega el interventor que conociendo como conoce al señor Schlüter y sabiendo que éste llevaría a efecto su amenaza, se allanó a complacer los deseos de la dirección del Banco Industrial.

"6.—Alega el interventor que a no ser por las razones que se expresan en la alegación 5 anterior, jamás hubiera consentido en que se aplicara ilegalmente la suma de $750 que le pertenecía a reembolsar los gastos que se expresan en la alegación 4 anterior y al pago de los cuales el interventor no estaba ni venía obligado en forma alguna.

"7.—Alega el interventor que el banco se enriqueció a su costa con la suma de $750 aplicada al reembolso de las mencionadas reparaciones de la casa de la calle de Las Flores y al pago de los gastos y honorarios de abogado del caso civil número 7575 de esta corte, y que, por tal circunstancia, el Banco Industrial está obligado de acuerdo con la ley, a devolver al interventor la expresada suma de $750.

"8.—Que el interventor presentó al síndico del banco aquí demandado la reclamación que ahora formula mediante esta demanda y que el síndico se niega a aceptarla y pagarle."

De la orden que declaró sin lugar la excepción previa hacemos el siguiente extracto (bastardillas nuestras):

". . . Aceptando, como estamos obligados a aceptar, los hechos de la demanda, tenemos que concluir que el Sr. Schlüter traspasó los límites de su derecho al obtener del ahora demandante el consentimiento para apoderarse de lo que no le pertenecía, mediante la amenaza de cobrarle por la vía judicial otras deudas ya vencidas que tenía García con el banco. Parece de aplicación el párrafo de Manresa que el abogado del interventor cita completo y que dice así:

" 'Esencial es también que se amenace con un mal, y en esta sola palabra nos detenemos, sin pasar a los adjetivos que la siguen, porque no entendiendo el legislador como mal aquello que el mismo derecho ampara o impone, deducimos de ahí la consecuencia importante de que el mal ha de ser injusto, y de que no intimida quien se limita

a invocar su derecho, sin abusar del mismo. Así no podrá decir el deudor que consiente en pagar bajo la amenaza de acudir a los tribunales y de las costas del litigio, que fué nulo su consentimiento, y en cambio lo será si, traspasando el acreedor los límites de su derecho, *hubiera arrancado del deudor con las mismas amenazas legales una novación de contrato o la confesión de una mayor deuda.'* 8 Manresa, Comentarios al Código Civil, 4ª. ed. 1929, 596.''

Si Manresa está en lo cierto, la corte de distrito también lo estuvo. Manresa, a nuestro juicio, substancialmente tiene razón. Si su exposición de la ley o de lo que la ley debe ser puede o no ser mejorada haciendo una nueva exposición, no es cuestión decisiva. El resultado en la corte de distrito fué correcto y su sentencia no debe ser alterada.

Las únicas autoridades citadas por el apelante en su alegato son *Burke* v. *Gould,* 105 Cal. 282; *Rivera* v. *Manufacturers Life,* 34 D.P.R. 246, y III ''Williston on Contracts'' 2833, sección 1606. Lo que se dijo en estos dos casos y cuanto se ha dicho en otros casos similares debe interpretarse a la luz de los hechos ante la corte en cada caso específico. No tenemos disputa alguna con la doctrina sentada en los dos casos en que se funda el apelante según la misma fué aplicada a los hechos expuestos en las dos opiniones. Los del caso de autos conforme han sido relatados en la demanda de intervención son muy distintos. El apelante cita de Williston las primeras cinco oraciones de la sección 1606. Esa sección debe ser tomada en su totalidad y en armonía con la 1607, que lee así:

''Medios de por sí legales no deben ser utilizados en forma tan opresiva que equivalgan a un abuso de los remedios legales. Aunque el embargo es de por sí legal, si resulta excesivo, o si se traba sobre bienes susceptibles de dañarse, o si se practica bajo circunstancias que hacen difícil al demandado evitar ceder a cualesquiera requerimientos, el utilizar el embargo con el fin de hacer cumplir demandas coactivas o colaterales es abusivo y las transacciones logradas por tales medios son anulables. Bajo circunstancias similares se ha resuelto que una amenaza de solicitar un síndico para una corporación equivale a coacción para con una persona que ha estado económica-

mente interesada en ella y cuya reputación sufriría con tal nombramiento. Aun la amenaza de entablar un litigio corriente puede ser formulada en tal forma que la haga ilegal como un medio de coacción, siendo también anulable la transacción por ella inducida. Así, pues, cuando una de las partes está en tal situación que pueda fácilmente ser dominada por la otra, o es un anciano y está decrépito, la transacción inducida por tal amenaza puede ser anulada. Sin embargo, cuando el procedimiento legal ordinario es utilizado o iniciado por una persona que cree tener derecho a una reclamación de la índole provista por tal procedimiento, debe haber sin duda una base real o tentativa de procedimiento. Qué es lo que equivale a tal abuso, es algo no susceptible de una definición exacta.''

En el ''Restatement of the Law of Contracts'' según fué adoptado y promulgado por el American Law Institute, vol. II, sección 492 pág. 938, hallamos la siguiente definición de coacción:

''Coacción en el 'Restatement' de este Título significa:
''(a) cualquier acto ilegal de una persona que obligue a una manifestación de aparente asentimiento por parte de otra respecto a una transacción contra su voluntad, o
''(b) cualquier amenaza ilegal hecha por una persona, de palabra o en cualquiera otra forma, que induzca a otro a entrar en una transacción bajo influencias de un temor tal que le impida ejercer su libre voluntad y criterio, si había la intención o si podía razonablemente esperarse que la amenaza induciría a actuar.''

El párrafo ''g'' del comentario lee así:

''g. Actos o amenazas no pueden constituir coacción a menos que sean ilegales, aunque hagan tal presión que impidan el ejercicio del libre albedrío. Sin embargo, los actos pueden ser ilegales dentro del significado de esta regla aunque no sean criminales o torticeros o no infrinjan un deber contractual. Al igual que los contratos pueden ser contrarios a la moral pública y éstos pueden ser anulados por tal motivo, y aunque la ley no impone penalidad alguna por celebrarlos, los actos que envuelven un abuso de los remedios legales o que son ilegales en el sentido moral, al ser utilizados como medios para causar temor vician una transacción resultante de tal temor, a pesar de no ser por sí mismos daños legales.''

La sección 493 clasifica las formas en que puede ejercerse

coacción. Entre otros actos ilegales que no caen claramente dentro de ninguno de los grupos incluídos en la tentativa de hacer una clasificación general, hallamos en la página 949 el siguiente ejemplo:

"A, acreedor de B, amenaza a B con iniciar un procedimiento para que se nombre un tutor a este último y se haga cargo de sus bienes a menos que B le firme un pagaré por el importe de la reclamación de A. B es un anciano de mente débil e inducido por el temor le firma el pagaré. En este caso existe coacción."

En *Foote* v. *De Poy*, 68 L.R.A. 302, se dice lo siguiente en el primer párrafo del sumario:

"La cesión de todas sus propiedades hecha por un hombre que ha perdido su sano juicio, en beneficio de un hijo menor de su divorciada esposa, en garantía de que ésta retirará los procedimientos por ella iniciados para nombrarle un tutor, será dejada sin efecto."

No había duda alguna respecto al derecho legal técnico de la divorciada a obtener el nombramiento de un tutor permanente con que había amenazado a su ex marido. Ya se había designado un tutor provisional. De Poy, el ex marido, había estado representado por letrado cuando vendió su remanente (*equity*) en una finca hipotecada y pagó el importe del mismo con el objeto de evitar que continuaran los procedimientos de tutela. El Tribunal Supremo de Iowa, sin decidir la cuestión relativa a la supuesta incapacidad de De Poy al celebrar la transacción, resolvió que los procedimientos de tutela y la designación de un tutor permanente de que se le amenazaba equivalía a un abuso flagrante de un remedio legal. La médula de la decisión puede hallarse en el siguiente párrafo (bastardillas nuestras):

"Al llegar a esta conclusión, podemos decir que es muy probable que ninguna de las personas que intervinieron para obtener el contrato fué inducida por un fin malicioso o avieso con el propósito de arrebatar o despojar de sus bienes a este anciano decrépito. En verdad podría asumirse que la divorciada creyó que éste podría malgastar o disponer del resto de sus bienes y que su motivo al instituir los procedimientos y al obtener el contrato no fué el de

enriquecerse a sí misma sino más bien el de lograr que se proveyera lo mejor para su hijo. El motivo era bastante laudable, pero los medios utilizados para cumplir tal fin no pueden ser sostenidos. William De Poy era mentalmente capaz o incapaz. *De haber sido capaz y de haber sido iniciados los procedimientos contra él para obligarle a entregar parte de sus bienes, ello equivalió a un abuso flagrante de la maquinaria legal con el fin de obtener una ventaja indebida."*

La divorciada tenía por lo menos visos de una reclamación contra De Poy por los alimentos del niño. En el presente caso el banco no tenía ni sombras de una reclamación contra García por el reembolso de los gastos hechos por éste en conexión con el procedimiento ejecutivo sumario y con las reparaciones de la casa núm. 29 de la calle de las Flores mencionada en la demanda. En el caso de autos no hay siquiera la circunstancia atenuante de un motivo laudable. En ésta, al igual que en todas las otras relaciones de hechos ante nos, hablamos, desde luego, de hechos aducidos en la demanda de intervención. Esa demanda y la excepción fueron las únicas alegaciones que había en la corte de distrito al momento de declararse sin lugar la excepción, y dicha corte al resolver esta última estaba obligada a aceptar como ciertos los hechos expuestos en la demanda. Al considerar el señalamiento de error del apelante esta corte está en la misma posición que lo estuvo la corte de distrito al declarar sin lugar la excepción previa. No existe pliego de excepciones, exposición del caso o transcripción de la evidencia, pero aún si no fuera así, estaríamos limitados (en lo que a esta sola cuestión planteada por el apelante se refiere) a los hechos que tuvo ante sí la corte de distrito al tiempo de declarar sin lugar la excepción. Empero, si consideráramos la contestación radicada por el síndico en unión de la sentencia final y de la relación del caso y opinión emitidas por el juez de distrito, no habría base satisfactoria para la conclusión de que el banco tuvo algún motivo laudable o alguna especie de reclamación contra García, fuera de las obligaciones que debían servir de base a la acción legal inminente.

En *Weber* v. *Kirkendall*, 39 Neb. Rep. 193, la corte dijo, en parte (bastardillas nuestras):

"En 3 de octubre de 1888 Magnes Weber adquirió de Flodman & Bruce una tienda de calzado al por menor en la ciudad de Omaha, y asumió una deuda por la suma de $820.71 que sus vendedores tenían con Kirkendall, Jones & Co. Flodman & Bruce habían comprado esta tienda a Johnson & Flodman, y éstos la hubieron de Thursie, Anderson & Flodman. Mientras esta última firma poseía el negocio, contrajo una deuda con Kirkendall, Jones & Co., de la cual permanecía insoluta la suma de $848.70 al tiempo en que Weber se convirtió en dueño del establecimiento. Weber al adquirir de Flodman & Bruce no asumió el pago de esta última suma. El 8 de octubre de 1888 Kirkendall, Jones & Co. indujeron a Weber a que viniera al establecimiento de ellos y al llegar allí lo llevaron a una habitación, no a su oficina, en el quinto piso de su casa mercantil, en la que se hallaban uno de los miembros de la firma de Kirkendall, Jones & Co. y su abogado, y el Sr. Thursie y su abogado. En este momento y lugar Kirkendall, Jones & Co. y su letrado falsamente manifestaron a Weber que éste les debía la suma de $848.70, o sea la deuda que con ellos tenía la antigua firma de Thursie, Anderson & Flodman, y le requirieron el pago de la misma, lo que Weber entonces hizo, transfiriéndoles un certificado de depósito de un banco de Omaha, certificado que a la sazón le pertenecía. Entonces Weber inició este pleito contra Kirkendall, Jones & Co. para recobrar el importe de dicho certificado de depósito, alegando que lo había entregado involuntariamente a Kirkendall, Jones & Co. mientras estaba ilegalmente privado de su libertad por ellos, y por temor a amenazas de éstos, de que si no pagaba la deuda de Thursie, Anderson & Flodman, ellos, Kirkendall, Jones & Co. se incautarían mediante embargo de su establecimiento de calzado. El caso fué juzgado por tribunal de derecho por haberse renunciado al jurado. La corte hizo ciertas conclusiones especiales y resolvió en términos generales en favor de Kirkendall, Jones & Co., y Weber apeló.

"Las conclusiones especiales de la corte inferior aquí pertinentes son como sigue: que Kirkendall, Jones & Co. no hizo ninguna amenaza directa de embargar el establecimiento de Weber, pero que con sus actos y manifestaciones le indujeron a creer que embargarían sus existencias de mercancías si no les pagaba los $848.70 reclamados; que Weber no habría pagado esta reclamación a no haber creído por los actos y manifestaciones de Kirkendall, Jones & Co.

que era el propósito de éstos embargar su establecimiento de calzado si él no les pagaba; que el dinero pagado por Weber no era para abonar a una deuda de él para con Kirkendall, Jones & Co., sino la deuda de un tercero. Estas conclusiones especiales de la corte de distrito, y la prueba de autos, establecen lo siguiente: que Kirkendall, Jones & Co. sabían que Weber no era legalmente responsable de la reclamación que le indujeron a pagar y que Weber efectuó este pago por temor a que si no lo hacía Kirkendall, Jones & Co. embargarían su establecimiento y arruinarían su negocio y que este temor fué llevado a la mente de Weber por los actos y manifestaciones de Kirkendall, Jones & Co. y su abogado durante la conferencia a que antes nos hemos referido. La cuestión precisa entonces es: ¿hizo Weber este pago voluntariamente? En este caso no se niega la validez de la reclamación de Weber. Desde el principio hasta el fin los demandados se defienden con fundamentos técnicos, siendo el principal de ellos que el pago fué hecho voluntariamente. Existe sin duda la regla general que todo dinero pagado voluntariamente, sin que medie fraude y con pleno conocimiento de todos los hechos, no puede ser recobrado por la persona que así lo ha pagado. No obstante, existen muchas excepciones a esta regla, o más bien ocasiones en que los pagos que han sido hechos bajo la presión de una emergencia forzada, no son considerados como voluntarios sino como compulsorios por la ley.

"Estas autoridades establecen la regla de que un pago ilegal efectuado por una persona con el objeto de obtener sus bienes de un tercero en cuya posesión están, que se niega a entregarlos a menos que se efectúe el pago, no es un pago voluntario y puede ser recobrado. El letrado de los demandados admite que esta regla es correcta, mas sostiene que no es aplicable a los hechos del caso de autos toda vez que los demandados al tiempo que obligaron a Weber a efectuarles el pago de la suma adeudádales por Thursie, Anderson & Flodman, no estaban en posesión del establecimiento de Weber; mas no podemos ver esta distinción. ¿Qué diferencia existe entre el principio de si los demandados indebidamente obligaron al demandante a pagar una deuda que no les debía, llevando a su mente el razonable temor de que si no pagaba se incautarían de su establecimiento y yendo en la primera oportunidad a incautarse de sus bienes y negarse luego a exonerar éstos de responsabilidad a menos que se les hiciera el pago exigido? Ambas formas de obtener el dinero fueron igualmente ilegales. Debe tenerse presente que los autos

demuestran que la reclamación hecha por los demandados al demandante era ilegal e injusta, y carecía de fundamento, y los demandados lo sabían. . . . *El letrado de los demandados alega que no puede hallarse precedente alguno a virtud del cual pueda recobrarse dinero pagado por haber temido la parte que lo hizo que si no efectuaba el pago el reclamante se incautaría de sus bienes valiéndose de recursos legales. No tengo duda de que cuando surgió el primer caso para recobrar el dinero que había sido obtenido del dueño mediante coacción por una persona que estaba en posesión de los bienes de aquél, a fin de inducir al opresor a devolver la propiedad, el letrado de la parte demandada argumentó que no podía hallarse precedente alguno que autorizara que tal pago fuese recobrado, que se trataba de un pago voluntario y que a fin de que la parte tuviera derecho a recobrar la suma pagada tenía que demostrar que efectuó el pago por temor a perder la vida o a sufrir daños corporales irreparables. Sin embargo, parece que la corte se dió cuenta de la emergencia y sentó un precedente, y a partir de esa fecha puede hallarse uno en el caso de Weber v. Kirkendall, 39 Neb. 193, en el que se autoriza se recobre el dinero que una persona ha pagado por temor de que si no lo hacía, el reclamante embargaría sus bienes."*

En el caso de *Sylvan Mortgage Co.* v. *Stadler,* 113 Misc. Rep. 659, la corte dijo, en las páginas 667 y 668:

"Desde luego, no puede hallarse un estado de hechos como el presente surgido de la acentuada escasez de viviendas, a que se haya aplicado el principio de coacción. Mas una situación nueva nunca ha servido de fundamento para que se niegue un remedio concedido por ley. Cada caso debe ser juzgado en sus méritos. En el caso de Barnett Oil & Gas Co. v. New Martinsville Oil Co., 254 Fed. Rep. 481, se usó lenguaje muy apropiado, y en él, después de discutirse el criterio más liberal de las cortes americanas sobre la aplicación de la defensa de intimidación, la corte dice a las páginas 486 y 487: 'A mi modo de ver, el resultado conduce a la conclusión muy familiar de que tal aplicación, en su análisis final, debe depender de los hechos de cada caso y que el juez debe actuar siempre con la más sana discreción; que no puede establecerse una regla inflexible; que el esfuerzo debe dirigirse a determinar el derecho y la justicia del caso.'

"Se sostiene, sin embargo, que la amenaza de realizar un acto legal no puede constituir intimidación y que el demandante estuvo justificado al amenazar con instituir un procedimiento de desahucio a no ser que se le firmara la escritura de arrendamiento. Ésta es

indudablemente la regla general. Dunham v. Griswold, 100 N. Y. 224; Lilienthal v. Bechtel Brewing Co., 118 App. Div. 205; McGuire & Co. v. Vogel Co., 164 íd. 173. Pero esa regla implica que las amenazas de entablar procedimientos legales son hechas con el fin de obtener algo a que la persona que las hace tiene derecho. Medios que de por sí son legales pueden ser utilizados en forma tan opresiva que equivalgan a un abuso de los remedios legales, aunque no es posible definir con exactitud qué es lo que equivale a tal abuso. 3 Williston Cont., sección 1607. Y conforme se dice en el tomo 1 de 'Page on Contracts' (sección 490), la amenaza de instituir una acción civil puede equivaler a coacción bajo circunstancias especiales. En este caso la maldad de la transacción no consiste en la obtención del contrato de arrendamiento ni en la amenaza de iniciar procedimientos de desahucio, sino en el hecho de que el demandante se aprovechó de la situación indefensa del demandado para exigirle una renta opresiva. Si el demandado, aún compelido por el temor de ser desahuciado el 1º. de octubre, hubiese firmado un contrato de arrendamiento con un cincuenta por ciento de aumento en la renta o cualquiera otra suma razonable, no procedería la defensa de intimidación. Cuanto se dijo en el caso de Kilpatrick, supra, es aplicable *mutatis mutandis* a este caso. El demandante tuvo en sus garras la propiedad del demandado hasta el importe del aumento en la renta más allá de lo razonable y no se avendría a la renovación del contrato a no ser que se conviniera en la exacción ilegal.''

La sentencia en ese caso fué revocada en el de *Sylvan Mortgage Co.* v. *Stadler,* 115 Misc. Rep. 311, no porque la corte inferior errara en su aplicación de la ley, sino porque los hechos no hacían caer el caso dentro de la doctrina de equidad reconocida por ambas cortes. Es cierto que la opinión de la corte de apelaciones contiene la aseveración sin salvedad de que: ''La intimidación nunca puede basarse en la amenaza de exigir derechos legales por medios legales.'' Empero, esta aserción debe ser interpretada en armonía con el contexto, y la opinión, a nuestro juicio, demuestra en su totalidad que no se tuvo la intención de que fuera tan amplia y sin reserva como parecería serlo si se le despojara de su escena y se le considerara aisladamente. Sea ello como fuere, es demasiado radical en sus términos, y si se le ha de interpretar literalmente, no podemos estar de acuerdo con ella.

Para los fines de este recurso, bastará que citemos los párrafos pertinentes de los sumarios de otros tres casos: *Rose* v. *Owen,* 85 N. E. 129; *Shelton* v. *Trigg,* 226 S. W. 761; y *Bither* v. *Packard,* 98 Atl. 929.

### Rose *v.* Owen:

"Cuando las amenazas, material o razonablemente pueden intimidar la voluntad de la parte amenazada, el contrato inducido por las mismas y resultante de tal coacción es nulo por intimidación."

### Shelton *v.* Trigg:

"Cuando el contrato de sociedad da al socio demandado el derecho absoluto a disponer de los bienes de la sociedad y a disolver la misma a su opción, y le da también el dominio absoluto sobre los otros socios, pero dispone que ningún socio recibirá remuneración por trabajo realizado para la firma, la actuación del demandado al amenazar con disponer de los bienes de la sociedad y en disolver la firma si no se le paga un sueldo por realizar el trabajo de los otros socios que ya había efectuado, *se resolvió* constituía coacción y le obligaba a una liquidación de los sueldos así pagados; la amenaza del demandado de ejercer un derecho contractual para efectuar un fin ilegal hizo que la amenaza fuera igualmente ilegal.

"Cuando el socio demandado mediante intimidación había obtenido un sueldo de la sociedad por los servicios por él prestados, contrario a los términos del contrato, amenazando ejercitar su derecho contractual de disponer de los bienes de la sociedad y de disolver la firma, él no tenía derecho. en equidad y buena conciencia a retener los sueldos así pagados, dentro de la regla de que para recobrar dinero pagado mediante coacción ha de demostrarse que resultaba contrario a la equidad y a la buena conciencia que el tomador los retuviera.

"Al determinarse qué constituye 'intimidación' no se va tanto a la naturaleza de la amenaza o a las palabras usadas, sino al efecto de la amenaza en la mente de la persona a quien se le hace, estando la corte en el deber de tomar en consideración la clase de individuo afectado y todas las circunstancias que rodearon la transacción, y cuando se desprende que el convenio ha sido celebrado mediante coacción, que las partes no actuaban con plena libertad, sino que la celebración del contrato fué el resultado de una elección entre

dos males, una corte de equidad se negará a hacer cumplir el contrato y decretará la devolución del dinero pagado bajo el mismo."

## Bither *v.* Packard

"El demandante obtuvo un préstamo del demandado con el objeto de completar el precio de la compraventa de una casa y le dió un pagaré por el referido préstamo y, luego de adquirir una farmacia, entregó al demandado sus pagarés a la vista por un préstamo adicional garantizado con una segunda hipoteca sobre su casa, así como una hipoteca sobre las existencias en dicho establecimiento, disponiéndose que él continuaría en posesión hasta que el acreedor se hiciera cargo de los mismos por incumplimiento del contrato. Al amenazar el demandado con ejecutar las hipotecas el demandante suscribió un convenio según el cual pagaría al demandado, mientras estuviera en el negocio de drogas, una suma mensual, que con los intereses sobre las sumas obtenidas a préstamo, ascendía a 40%. *Se resolvió* que las transacciones eran tan irrazonables y faltas de causa que daban derecho al demandante a recobrar el dinero pagado al demandado.

"Cuando una persona tiene en su poder dinero que en equidad y buena conciencia pertenece a otra, la ley creará una promesa implícita de parte suya de pagarla a quien corresponda, y en tal caso procede una acción en cobro de lo indebido.

"Una acción en cobro de lo indebido es amplia en su alcance y aunque en su forma es un procedimiento en ley, en cuanto a su fondo es una acción en equidad, y la justicia sustancial que promueve hace que la misma sea favorecida por las cortes.

"Procede una acción en cobro de lo indebido por dinero pagado bajo protesta u obtenido mediante fraude, intimidación, extorsión, coacción o por cualquiera otra ventaja tomada indebidamente de la situación del demandante o pagada en cualquiera otra forma involuntaria o indebidamente.

"Cuando se prueba que un demandado tiene en su poder dinero de un demandante que *ex aequo et bono*, debe devolver, la ley de manera concluyente presume que él ha prometido hacerlo así, y el jurado está obligado a resolver de conformidad, y luego de rendirse un veredicto, se presume que la promesa ha sido realmente probada."

No se ha llamado nuestra atención hacia ningún caso en que una corte haya resuelto que en circunstancias similares

a las de los hechos que nos ocupan, la amenaza de embargar los bienes de un deudor y los bienes de sus fiadores no equivalga a intimidación.

Si García, con el propósito de evitar que se ejecutara una hipoteca, hubiese traspasado los bienes hipotecados al acreedor y éste hubiera convenido en devolvérselos dentro de determinado período de tiempo al pagársele una cantidad ligeramente superior al principal garantizado por la hipoteca, y si García hubiese pagado dicha suma sin protesta como causa (*consideration*) de una retroventa o traspaso, él no tendría motivo alguno para quejarse de intimidación. *Burke* v. *Gould,* supra. Si bajo circunstancias similares a las reseñadas en *Rivera* v. *Manufacturers Life,* supra, García hubiera entregado para su cancelación una póliza de seguro de vida y si luego de consultar con su abogado, García hubiese hecho efectivo un cheque por él recibido como causa (*consideration*) para la entrega, él no podría, a base de intimidación, evitar el resultado de tal entrega y cancelación. El banco pudo haber exigido garantía adicional y pudo haber dicho a García que si no la prestaba, procedería a embargar sus bienes y los de sus fiadores. Tal amenaza no habría equivalido a intimidación, y si García hubiera prestado la garantía adicional para evitar la acción inminente, él no podría haber alegado con éxito que hubo intimidación. *Rodríguez* v. *M. Joglar & Co.,* 46 D.P.R. 350. Desde luego, el banco pudo haber informado a García que si no pagaba la deuda en su totalidad o cualquier parte específica de ella, o que si no autorizaba al banco a abonar los $750 que tenía en su poder como pago parcial de tal deuda, éste procedería inmediatamente, nadie sostendría que si García se hubiese allanado a despojarse de la propiedad en esa forma, el contrato hubiese estado viciado por intimidación. Puede admitirse para los fines de esta opinión que el banco pudo haber exigido y recibido como precio de su condescendencia una suma que no cayera dentro de la

definición estatutaria de usura. Quizá, sólo para los fines de la argumentación, podrá admitirse más que ésto, pero no es necesario que llevemos la exploración más lejos. No estamos sosteniendo la posición del apelante.

La regla de que la amenaza de un acreedor de valerse de sus remedios legales no equivale a intimidación, jamás fué intentada para destruir los fines de la justicia. No es una regla inflexible. Es una que debe ser aplicada inteligentemente en aquellos casos en que lo es. No es regla que debe seguirse ciegamente cuando bajo las circunstancias peculiares de cualquier caso específico el resultado sería contrario a la equidad, irrazonable para el deudor, o injusto. El juez de una corte de equidad o de ley debe estar, y a nuestro juicio lo está, en libertad de ejercer una sana discreción en su esfuerzo "de ver el derecho y la justicia del caso y así hacerlo." *Barnett Oil & Gas Co.* v. *New Martinsville Oil Co.*, 254 Fed. 481, 487.

La amenaza de embargar los bienes de García y los de sus fiadores no puede segregarse del conjunto de que forma parte integrante y considerársele como el único hecho ante nos. La situación ideada y creada por el banco antes de efectuar su amenaza es igualmente una parte saliente del mismo todo indivisible. El banco, mejorando la oportunidad ofrecídale por la posesión que tenía de los bienes de García en su capacidad fiduciaria, tomó esos bienes en su propio beneficio. De ese modo el banco privó a García de los medios para oponerse a cualquier pleito que el banco pudiera iniciar, sin mencionar los medios con que pagar su deuda al banco o los medios con que solicitar un recurso por la apropiación ilegal de sus bienes. En otras palabras, el banco le ató primeramente las manos a su deudor y luego le presionó con la amenaza de embargarle sus bienes y los de sus fiadores. Tan sólo por razón de la indebida ventaja así obtenida estuvo el banco en posición de obligar a García a someterse involuntariamente *nunc pro tunc* al tratamiento ya recibido por él

de manos del banco. Estas son las circunstancias bajo las cuales se nos pide que digamos que la amenaza de efectuar un embargo no equivalió a intimidación. No estamos en posición de hacerlo así.

*Debe confirmarse la sentencia apelada.*

El Juez Asociado Señor Wolf, disintió.*