**John C. FRANK, Plaintiff–Cross Appellant,**

v.

**Victoria BLOOM, Defendant–Appellant.**

**Nos. 79–1061, 79–1062.**

United States Court of Appeals, Tenth Circuit.

Argued Sept. 18, 1980.

Decided Nov. 5, 1980.

Ronald K. Badger, Wichita, Kan., for defendant–appellant.

D. Lee McMaster of McMaster & Smith, Wichita, Kan., for plaintiff–cross appellant.

Before DOYLE, McKAY and LOGAN, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

### Introductory

John C. Frank, the plaintiff–appellee and cross–appellant, originally brought an action against Victoria Murdock Bloom, the defendant–appellant, to recover his attorney's fees for services rendered to Mrs. Bloom during a period starting June 4, 1971 and continuing to April 10, 1973. Frank's claim was for $107,000. The cause was tried before a jury which rendered a verdict in the amount of $85,000. Mrs. Bloom has appealed the final judgment based upon this award. Frank has filed a cross appeal from the trial court's order disallowing pre–judgment interest on the award.

Frank was originally hired by Mrs. Bloom to represent her interest in the Murdock litigation which is also pending in this court. Mrs. Bloom was a member of the Murdock family which owned a newspaper in Wichita, Kansas. The paper had been in the Murdock family since the newspaper was originally founded by Mrs. Bloom's grandfather, Colonel Marshall Murdock, in 1872. When he died in 1914 the newspaper was inherited by his three children, Marcellus, Victor and Pearl. Each received one–third. Victor's one–third passed to his daughter, Katherine Henderson, and his grandson, Victor Delano. Pearl's one–third share passed to her grandson, Harry B. Brown. Victoria's father, Marcellus Murdock, following his death on March 10, 1970, left his share in a trust which he had created during his lifetime. He placed one–half of his interest in the paper, or one–sixth of the stock, in that trust. The trust created five shares, one for his widow and one for each of his four children. In 1966 Marcellus Murdock created a testamentary trust. In this he provided five shares, one for his widow and one for each of his children. The remaining one–sixth share of stock of the newspaper was willed to the testamentary trust.

There were six surviving heirs of Marcellus – his widow Paula, his three children, Marshall Murdock, Janet Jennings and Victoria Bloom, and two grandchildren of Jane, his deceased daughter, Vici McComb and David Colwell.

### The Will Litigation

Frank was employed by Victoria Bloom on June 4, 1971 in connection with litigation concerning the interest which the widow of Marcellus, Paula, was entitled to receive from the estate. This dispute was litigated in state court in Wichita. It centered on the interpretation and validity of an Anti–Nuptial Agreement executed in 1940, a Will executed in 1966 and a Codicil to the Will executed in 1967. The widow, Paula, took the position that she was entitled to one–half of the estate. The son, Marshall, here contended that Paula was entitled to one–fifth of the estate in accordance with the Anti–Nuptial Agreement. Victoria Bloom

disputed the claim of Paula that she was entitled to one–half and contended that she should receive nothing at all.

A provision in the Will of Marcellus stated that Paula should receive nothing if she and Marcellus were not living as husband and wife at the time of his death. The facts were that Marcellus, after having lived with Paula for 24 years, moved out of the family residence. She, however, continued to live there until Marcellus' death. The trial court determined that Paula was entitled to a one–fifth share in accordance with the Anti–Nuptial Agreement.

This decision was affirmed by the Supreme Court of Kansas which held that the clause in question encouraged separation and was on that account contrary to public policy and unenforceable.

The trial judge in the will or widow's case awarded plaintiff–appellee Frank the sum of $48,000 for his services in the estate proceedings. Later the state supreme court ruled this sum to be not payable out of the estate. It did not comment on the reasonableness of the award.

### Voting the Stock

There was also litigation concerning the voting rights of the trustee. The beneficiaries of the trust sought to have the bank vote the stock in accordance with their wishes. The bank refused, however, to do so. Mrs. Bloom's position was the same as that of the bank: that the trustees should vote according to their own discretion, and not necessarily in accordance with the wishes of the beneficiaries.

### Sale of the Newspaper

A third trial arose in connection with the sale of the newspaper to Ridder Publications, Inc. This action was brought by Victor Delano seeking an injunction against the sale of the newspaper and requesting damages from all other shareholders. The court did not enjoin the sale of the newspaper. It was during this injunction trial that Frank withdrew as the attorney for Mrs. Bloom. He testified that Mrs. Bloom insisted that he call her as a witness and ask her questions which she had previously prepared but had refused to allow Frank to review. He advised her that she was not needed as a witness since the hearing was limited. After denial of the injunction the newspaper was sold to Ridder Publications for $42,000,000.

At the outset of the Bloom–Frank relationship the understanding was that Frank was to be paid fees based upon the hourly rate of $50.00 per hour. Frank's contention is that this contract was modified early in the relationship. Mrs. Bloom testified that she was approached by Frank with the suggestion that he seek his fees from the estate with the understanding that if the estate was not held liable he would seek to be paid by Bloom. Bloom maintained that Frank informed her that all of the attorneys were seeking to be paid by the estate and asked her if she wished for him to do the same. Frank's version was similar, with the exception that he claimed that it was Bloom who approached him with the idea of his seeking his fees from the estate. Frank said that he did not give Bloom an answer until he had thought about and researched the issue. He said that at some later date he advised her that he would seek payment from the estate and have the court allow the fee; that he would no longer bill her on a regular basis. Frank also testified that he and Bloom agreed that if the court refused to grant the fees from the estate he would continue to look to Bloom for payment and that his fees would be what he considered to be reasonable and could be more or less than the $50.00 per hour.

The testimony on behalf of Mrs. Bloom as to the fee arrangement generally was that her contract with Frank was for $50.00 per hour, and that this contract never changed. She maintained that nothing was said about changing the $50.00 hourly rate to be charged nor was there anything said about the court *setting* the fee. She understood that Frank would try to get his fee from the estate at the $50.00 per hour rate. She understood that if the estate did not pay that she would have to pay as originally agreed, i. e. $50.00 per hour.

In his counterclaim Frank alleged that the reason for the change in the fee arrangement was Mrs. Bloom's excessive demands on his time. In his answer he claimed that in an itemized statement he told Mrs. Bloom that the excessive demands on his employment by her were placing a severe burden on his law practice and that he would prefer to withdraw. The answer further stated that Mrs. Bloom encouraged him to continue to represent her and indicated her willingness to forego the hourly fee contract and replace it with a reasonable compensation arrangement. Frank also testified at the trial that he told Mrs. Bloom that he did not know whether the fee based on reasonable rates would be higher or lower than under the original contract, but in his deposition he testified that his feeling was that the fee would probably be lower.

Frank testified at the *estate* hearing on fees that his office had spent 450 hours on the case and that his fee should be from $38,000 to $48,000. According to Bloom's brief, this would have amounted to $85.00 to $106.00 per hour based on 450 hours. The worksheet showed that approximately 280 hours had been spent on the case.

The additional amount demanded by Frank derived from representing Mrs. Bloom in the two state court cases, one having to do with the widow's case and the other the voting case. Both of these pertained to control of the newspaper.

Somewhat later, on March 2, 1973, Mrs. Bloom said that she learned the newspaper had been sold and that this sale had been arranged by Mr. Kitch and Mr. Brown. Mrs. Bloom finally did sell her stock, notwithstanding that Kitch was going to receive a finder's fee from the buyer of the paper based upon the number of shares that he was able to sell. Mr. Delano filed a lawsuit seeking to enjoin the sale of the newspaper and Frank represented Mrs. Bloom in that case and filed a cross claim against Kitch to recover Mrs. Bloom's portion of the finder's fee.

After the Supreme Court of Kansas ruled that the estate was not responsible for the fee here in question, Frank billed Mrs. Bloom for the sum of $107,500 for the representation in the several cases. However that was not itemized or broken down according to the various cases in which he had participated. This present suit was filed September 26, 1974. Originally Frank employed the Kitch firm to bring the fee action against Mrs. Bloom. Mrs. Bloom took exception to Frank hiring the Kitch law firm to bring the action against her because she had been adversary to Kitch in the other litigation. She sought to have the Kitch firm disqualified from trying the present case, i. e. for the attorney's fees. Later the Kitch firm voluntarily withdrew.

### The Contentions of Mrs. Bloom

There are a great many assignments of error and we list *all* of them. She asserts that the trial court

1. Erroneously failed to instruct the jury that a contract for additional compensation entered into under threat of withdrawal following partial performance of the fee contract was invalid.

2. Failed to instruct the jury as to the legal effect of the $48,000 award to Frank given by the Kansas judge in connection with the litigation in the estate of Marcellus Murdock. (Under the Supreme Court of Kansas ruling the estate was not liable for this fee.)

3. Failed to instruct that a fee contract which was changed after the attorney—client relationship went into effect was void per se or voidable at the election of the client.

4. Erred in not granting a new trial or in not granting a remittitur as an alternative to a new trial.

5. Erred in admitting the desk calendars of Frank into evidence together with the estimated number of hours shown on those calendars.

6. Erroneously received evidence showing the amount of money saved Mrs. Bloom by virtue of the reduction of the widow's share of the estate, in that this analysis was based on the value of the stock sold in 1973 instead of the estate inventory value in 1970.

7. Erred in failing to instruct the jury regarding a determination of a reasonable fee in the event that the jury found that the original hourly rate contract had been charged.

8. Erred in instructing the jury that in order to find a modified contract invalid it must determine that the client was under the domination of the attorney.

9. Committed grievous error in withdrawing from the jury the issue of disentitlement to attorneys' fees as a result of conduct of the attorney which is against the best interests of the client.

I. *Did The Trial Court Err in Failing to Instruct the Jury That a Contract Between An Attorney and Client Which is Modified Under Threat of Withdrawal by the Attorney is Invalid?*

During the pleading stage in the case, an answer was filed on behalf of Frank, responding to Mrs. Bloom's counterclaim. In the answer Frank alleged that Mr. Frank and Mrs. Bloom had modified their initial contract; that Frank had notified Mrs. Bloom that he wished to withdraw from her case due to the excessive demands of being employed by her. Frank also alleged that Mrs. Bloom objected to Frank's withdrawal and offered to replace the $50 per hour fee with a reasonable compensation standard if he would continue to represent her. That identical statement appeared in a letter written by one of Mr. Frank's attorneys to the trial judge in this case, United States District Judge Wesley Brown, explaining the reason for the change in the fee arrangement. Mrs. Bloom's lawyer brought all of this out in an effort to impeach the testimony of Frank during the trial.

The factual matter contained in the pleadings is admissible as an admission by a party made by his agent acting within the scope of his employment. Such evidence is admissible for substantive purposes, and need not be received solely for impeachment purposes. See Weinstein on Evidence, 1978, 801(d) [01], page 801–10, and 801(d)(2)(D)[01], page 801–137. At the trial Frank repudiated the statements made by his lawyer, saying that they were incorrect. However, he is nevertheless bound by his lawyer's admissions on his behalf.

It is significant that Mrs. Bloom did not claim at the trial to have been influenced to agree to a change in basis for computing fees by any threat made by Mr. Frank. These admissions were used solely to try to impeach Frank. One thing is clear, and that is that the evidence on this question of a change in the fee standard was in sharp dispute at the trial. It is also plain that although Mrs. Bloom now contends that the contract was modified under threat of Frank's withdrawal, it does not appear that she raised that at trial. In fact, she denied that the parties ever discussed modifying the contract.

Nevertheless, the trial Judge gave an instruction that "any admissions contained in the pleadings .... must be accepted by you as true and are not required to be supported by additional evidence." The jury could have concluded that based upon the admissions in Frank's pleadings, he had, indeed, threatened to withdraw and the instructions permitted the jury to question whether Mrs. Bloom relied on such withdrawal.

The jury was also instructed that a presumption of undue influence exists when contracts are made between parties to a confidential relationship. Further, the Court told the jury that Mr. Frank, as a domineering party, had the burden of showing that the contract was made in good faith without unfairness or overreaching and for a valuable consideration.

A further instruction given by the trial judge charged the jury that a modifying contract would be invalid if a confidential relationship existed between the parties, if, in addition, Mrs. Bloom was, in fact, under the domination of Frank, and the modification lacked consideration, was unfair, unreasonable, the result of overreaching, coercion or inequitable conduct, and was not freely and voluntarily entered into and with full understanding of its terms and consequences.

There is case law holding modified agreements for attorney fees invalid in circumstances in which the court found that the clients had had no freedom of choice and had agreed to the change in reliance on the threat of the lawyer to withdraw. *Egan v. Burnight*, 34 S.D. 473, 149 N.W. 176 (1914), and *Griffin v. Rainer*, 212 Va. 627, 186 S.E.2d 10 (1972). In the cited cases the courts found that the client had relied on the attorney's threat of withdrawal. In Griffin, for example, the court said that the client lacked freedom of choice to resist the pressure which had been applied by the attorney. If the jury had determined that Mrs. Bloom was similarly pressured, notwithstanding that she had not claimed that she had been so influenced, the instructions to the jury which were here given and which are described above would have adequately covered the subject whereby the jury could have found the contract to have been invalid.

■ The instructions which were given to the jury regarding attorney pressure in relation to the voiding of a contract were thus adequate. The failure of the jury to rule that Mrs. Bloom was pressured was due to lack of evidence rather than to lack of a specific instruction pinpointing the appellant's theory of the case. We are unable, therefore, to find that the court committed error in its treatment of the foregoing.

II. *Did the Trial Court Err in Not Instructing the Jury as to the Legal Effect of the Witness Judge Stephan's Testimony On This Dispute?*

■ Judge Stephan was the judge in Wichita who presided in the widow's case. As noted previously, concern had to do with whether Marcellus Murdock's widow was entitled to one–fifth or one–half of her husband's estate. Judge Stephan awarded Frank $48,000 for his services in that case. The Kansas Supreme Court reversed the part of the decision which charged this fee to the estate, and so the parties continue to dispute whether the Frank–Bloom agreement for the payment of $50 per hour is in effect, or whether it is a question of the reasonable value of Frank's services. Judge Stephan, the man who made the determination that the services were worth $48,000, testified at trial that the $48,000 was reasonable for the services rendered by Frank. Mrs. Bloom maintains here that the jury should have been informed that the court's award had no binding relationship to any contract between the parties; that it was not binding between her and Frank; that Mrs. Bloom was not obligated nor entitled to call the court's (meaning Judge Stephan) attention to the $50 per hour contract that she believed to be in effect.

The instruction of the trial court here stated:

If you find (Mrs. Bloom) made an enforceable agreement to pay (Mr. Frank) the reasonable value of his services in the widow's case, then you may consider from the evidence the amount (Mr. Frank) is reasonably entitled to recover. On the other hand, if you find (Mrs. Bloom) made no enforceable agreement to assume and pay such fees, if not payable out of the estate, then the basis for (Mr. Frank's) recovery in the widow's case would be the terms of the original contract of employment as you find them.

The jury was further instructed that even though Judge Stephan was called as an expert witness to value Frank's services the jury was not bound to accept Judge Stephan's testimony; that his testimony was to be considered by the jury in the same manner as any other evidence; and that the testimony should be given the weight and credit the jury deemed appropriate. The jury was also told that it was up to it to determine whether Mrs. Bloom had contracted to pay Frank the reasonable value of his services or whether the terms of the original contract governed. Moreover, the jury was told that Judge Stephan's award did not bind the jury.

In view of the extent of the instructions given by the court, we are unable to see a need for an additional one saying that Judge Stephan's award was not binding on the jury. The jury was told in plain terms that the $48,000 was not binding on it and

further instruction could only cause confusion. Appellant's claim of error must be denied.

III. *Is Mrs. Bloom's Argument That the Trial Court Erred in Refusing to Instruct the Jury That a Fee Contract Change After The Creation of the Attorney–Client Relationship is Void Per Se or Voidable at The Election of the Client a Valid One?*

█ We hold that the trial court did not err in not so instructing. Mrs. Bloom's argument springs from her claim that such an instruction is in harmony with the law of Kansas which upholds strict rules of conduct for fiduciaries. No showing has been made, however, that the Kansas Court has embraced this specific principle. The general rule is that a contract made during the existence of an attorney–client relationship is valid and enforceable if it is fair and equitable. 13 ALR 3d 710 (1967). Mrs. Bloom's argument is not reasonable. It seems highly unlikely that the Kansas Supreme Court would hold that a client has the power to void any fee contract which comes into existence after the attorney-client relationship has arisen. This argument is not shown to have support in Kansas law, and, therefore, Appellant's claim of error on this is denied.

IV. *Was it Error to Instruct the Jury that in Order to Find a Modified Contract Invalid It Must Determine that the Client was under the Domination of the Attorney?*

█ The claim of error is based on appellant's belief that domination is presumed as a consequence of the attorney–client relationship, and thus a modified contract between an attorney and his client is void per se or void at the client's election. However, as stated above, there is no indication that Kansas follows this minority per se doctrine. The Kansas pattern jury instruction states that when deciding whether the party is to be relieved of his responsibilities because of undue influence the jury may be instructed to consider whether the moving party to a confidential relationship is under the domination of the other party. See Kansas Pattern Instructions, Section 18.-02G. The instruction given by the trial court was in accord with the present Kansas law. Thus, this contention lacks merit.

V. *Did the Trial Court Abuse Its Discretion in Denying the Motion for New Trial or a Remittitur as an Alternative to a New Trial Based on the Fact that the Amount of the Verdict, $85,000, is Excessive and Contrary to the Weight of the Evidence?*

A. Was There Insufficient Evidence for the Jury to Find That the Parties had Modified the Original Contract?

█ Mrs. Bloom maintains that the jury necessarily found that the parties had modified the original contract. As we have previously noted (many times) there were two opposing versions: Mrs. Bloom maintained that the contract continued to be based upon the $50 per hour rate (or nothing). Frank contended that soon after his employment the contract was modified to require that Mrs. Bloom pay him a reasonable fee. Frank said that the other members of his law firm were aware of the alleged modification. This, however, was never corroborated. The jury was left to determine who was telling the truth as between Frank and Mrs. Bloom. The parties agreed that there had been some modification in the arrangement in that Mrs. Bloom ceased to pay Frank on a regular basis, and also the fees attributable to the widow's claim were agreed to be obtained from the estate if possible. It is difficult to say that the jury reached a result which was clearly erroneous inasmuch as they were called upon to evaluate and determine the credibility of the parties as witnesses. The evidence was sufficient to show that reasonable minds could differ and, therefore, the trial court was within its authority in denying a new trial. See *Fireman's Fund Ins. Co. v. Aalco Wrecking Co.*, 466 F.2d 179 (8th Cir. 1972); *cert. denied* 410 U.S. 930, 93 S.Ct. 1371, 35 L.Ed.2d 592 (1973).

B. Did the Evidence Justify, Under the Standard of a Reasonable Fee, the Allowance of $85,000?

The instruction required the jury, if it determined that the contract had been modified so as to pay Mr. Frank the reasonable value of his services, to take into account the following factors in determining that value:

1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude her employment by the attorney.

3) The fee customarily charged in the locality for similar legal services.

4) The amount of money . . . involved in the controversy and the result secured for the client.

5) The nature and length of the professional relationship with the client.

6) The experience, reputation and ability of the attorney performing the service. [Tr.Vol. V, p. 102]

Mrs. Bloom argues that there was insufficient evidence as to the value of the services rendered whereby the jury could determine reasonable value and that there was insufficient evidence as to the total hours spent by Frank on her behalf. However, several witnesses did testify giving opinions as to the value of such services and the jury was at liberty to give to that testimony the weight that the jury deemed appropriate. As to the testimony concerning the number of hours: Frank's desk calendars were introduced; these had been kept by Frank's secretary; a ledger and time sheet prepared by secretaries were introduced. These were prepared for the litigation in question. Much of this evidence was somewhat inconsistent and contradictory, and therefore, had limited probative value. All of these discrepancies and contradictions were called to the attention of the jury, however, and undoubtedly were considered by it. The Judge instructed the jury that the issue was to be determined by you on the basis of the evidence presented. In making this determination, you may consider the failure to keep proper records and the passage of time between the rendition of services and arriving at an estimate as effecting the reliability of such evidence.

■ The law is very clear that reviewing courts are not at liberty to set aside jury verdicts merely because the reviewing judges feel that opposite results seem more reasonable. See *Tennant v. Peoria and P. U. Ry. Co.*, 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520 (1944). The *Tennant* case pertained to a motion for a judgment notwithstanding the verdict. However, the rule has been applied to motions for new trial. See *Firestone*, supra; *Lind v. Schenley Industries, Inc.*, 278 F.2d 79 (3rd Cir. 1960), *cert. denied* 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60; *Duncan v. Duncan*, 377 F.2d 49 (6th Cir. 1967); *cert. denied* 389 U.S. 913, 88 S.Ct. 239, 19 L.Ed.2d 260. It is to be noted also that Frank had obtained an award from the Judge who tried the widow's case in the amount of $48,000 for the effort in that case. Even though the trial court instructed the jury that this was not binding, it may have had influence because this was a limited part of the total work performed.

■ The trial judge was not at liberty to set aside the verdict, unless it was *clearly* against the weight of the evidence. See Moore's Federal Practice, 59(5) 1979. Even if the judge would have reached a decision different from the jury he would not be justified in interfering with the jury's conclusion because the credibility of the witnesses is for the trier of the facts; in this case, the jury. In order for the court to set aside the jury verdict it must clearly appear that the jury reached a seriously erroneous result. Moore, Section 59.08(5), pages 59–159. There are no unusual or special circumstances here to warrant a finding that the trial court's action, in failing to set aside the verdict, constituted an abuse of discretion.

■ Considering the broad discretion that the trial court has in ruling on motions

for new trial, we must conclude that no grounds existed in this case to warrant the overturn of the jury's verdict and the granting of a new trial. Accordingly, the appellant's contention that error was committed in this respect is denied.

### VI. *Was it Error for the Trial Court to Receive Into Evidence Frank's Desk Calendars?*

At the very outset the trial court, in its instructions to the jury, mentioned the lack of proper records and the time lapse between the rendition of the services by Frank and the attempt to estimate the number of hours spent by Frank. In addition, the testimony at trial pointed out the lapse of time and also the insufficiency of the records. Thereby the jury was in a position to determine the weight to be given to the information in the calendars and to reach a conclusion concerning the number of hours devoted to the task. Federal Rule of Evidence 401 provides that evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more proper or less proper than it would be without the evidence. Rule 401 defines relevance in broad terms. In the light of these guides it cannot be said that the desk calendars lacked "any tendency" toward probativeness as to the number of hours spent by Frank on behalf of Mrs. Bloom.

Relevant evidence is to be excluded only if its probative value is outweighed by danger of unfair prejudice, confusion of the issues, misleading the jury or by questions of undue delay, waste of time or needless presentation of cumulative evidence. Federal Rule of Evidence 403. It was brought to the jury's attention that there was a lack of proper records and a lapse of time before such records were compiled. It is not apparent that the probative value of the evidence was circumstantially outweighed by other dangers. It was open to the jury to attribute to the evidence any amount of weight that it deemed proper and this could have been resolved in favor of Frank or against him.

In addition, it is argued by Mrs. Bloom that Frank took the position during the pretrial procedure that the calendars would not be used in and of themselves as evidence showing hours, but would be limited to refreshing his memory on the work that he was doing. Therefore, Mrs. Bloom contends that Frank cannot rely on this evidence at trial. However, Frank never asserted that the calendars were not reliable; he merely asserted that he was not planning to rely on them. Frank was ordered to produce the calendars during the discovery stage and he did so over his own objections on the grounds of confidentiality. He blocked out the confidential parts and gave copies to Mrs. Bloom. Inasmuch as these were discovered by Mrs. Bloom and were produced, there does not appear to be any reason for not allowing them to be used for whatever value they may have had. Accordingly, the assignment of error in connection with the desk calendars should be and is hereby denied.

### VII. *Did the Trial Court Err in Ruling That the Amount of Money Which Was Saved Mrs. Bloom in the Widow's Case Based on the Sale Price of the Newspaper Three Years After the Trial of the Case Was Relevant and Could Be Received in Evidence?*

The position of Mrs. Bloom in the widow's case was that the widow should receive nothing. The widow, Paula Murdock, claimed one–half of the estate. She was restricted to one–fifth. Mr. Frank's argument is that due to his efforts, Mrs. Bloom's share of the estate was enhanced as a result of the reduction of the widow's share from one–half to one–fifth.

To demonstrate that Mrs. Bloom profited from the result in the widow's case, Frank presented evidence as to the value of the estate before the case and thereafter. The figures were used to show the value of the newspaper three years afterward when it was sold. Mrs. Bloom's position was that only the value of the paper at the time of trial ought to have been shown.

██ In the circumstances presented it was not prejudicial to reveal the sale price. At the time of the widow's trial it was easy to predict that the paper would be sold. It is true that it was sold at its inflated value, but this was a product of the times. Certainly the jury could cope with this factor. The numbers were not important. The relevant item was the fact that Frank had saved Mrs. Bloom a substantial sum of money regardless of the sale price. Mrs. Bloom was seeking to show that Frank was of no help or of little help in the widow's case. Frank was entitled to show that his effort did enhance ultimate recovery.[1] Obviously Frank did not bring about the inflated sale price, but he might have anticipated it. True, the amount of money that Mrs. Bloom ultimately received is of problematical relevance, but it ought not to require overturning of the verdict. See Moore's Federal Practice Sec. 10311.11, P. I–21–22.

VIII. *Was it Error for the Trial Court to Withdraw from the Jury the Issue of Alleged Forfeiture of Attorney's Fees to Frank Based on His Failure to Act in Accordance with Mrs. Bloom's Request or Because of His Alleged Disloyalty?*

This problem derives from the action of the trial court (Judge Templar) in withdrawing from jury consideration the defense of Mrs. Bloom to the payment of the attorney's fees based upon a number of instances in which he allegedly acted contrary to Mrs. Bloom's interest. The trial court summarized the issue as follows:

The defendant Bloom as a defense to plaintiff Frank's claims contends that plaintiff Frank has lost his right to fees in the widow's case and the voting trust case under the $50 per hour contract because he failed to take the deposition of Paul Kitch; because he failed to file the cross–claim against Kitch in the Delano–Kitch case; that he looked to Paul Kitch for advice as to whether she should sell her stock in the Eagle–Beacon newspaper when he knew that a decision not to sell would reduce Kitch's finder's fee and also knew there was a strong possibility that she could stop the sale altogether, resulting in no finder's fee; and that he employed the firm of Fleeson, Gooing, Coulson and Kitch to file his suit against her and represent him, which led to the turning over to that firm of attorneys his entire file in the Delano–Kitch case while it was on appeal.

Now, you're instructed that the Court is withdrawing these issues from your consideration and you will not consider these matters in your deliberations.

Mrs. Bloom's argument that Frank forfeits all compensation because of the six instances in which he is alleged to have acted in a manner detrimental to the interest of Mrs. Bloom is in truth a claim of malpractice against Mr. Frank.

It is important to point out that the only evidence in the record that Frank acted in a way that could be described in the court's instruction is in the descriptions of what occurred. There is no evidence evaluating his course of conduct so as to establish that he conducted himself contrary to law or in an unethical way. The appellant treats this alleged misconduct as if it was per se illegal. It might have been helpful if there had been an expert witness who condemned Frank's activities as being contrary to her interest. This would possibly have created an issue for the jury to determine. As the record stands, the jury would have been required to engage in speculation as to whether Frank's misconduct was in her interest or contrary to her interest.

 But there is a more serious deficiency in Mrs. Bloom's position. A requisite in a malpractice claim is that the client must have been damaged and hence aggrieved as a result of action of the attorney. The fact, if it be a fact, that the attorney in the heat of the trial disregards the direction of the client as to trial strategy or activity does not give the client a right of action against the attorney. After all, it is the

---

1. Her share was increased in the amount of $121,000 at the time of trial. The amount of ultimate enhancement based on the sale price was $525,000.

duty of the attorney who is a professional to determine trial strategy. If the client had the last word on this, the client could be his or her own lawyer. Therefore, an attorney does not ordinarily violate his duty to the client by rejecting a client's suggested tactic.

 Furthermore, in order for a client to have a cause of action against the attorney that client must have suffered money damages from the act of the attorney. This damage is not presumed; it must be proven.

The Sixth Circuit considered a claim of malpractice against an attorney in the case of *Woodruff v. Tomlin*, 593 F.2d 33 (6th Cir. 1979), aff'd. in part, rev. in part after rehearing en banc, 616 F.2d 924 (1980). In the first opinion that court stated:

> An attorney, like any other professional, is liable for acts of negligence in the conduct of his professional work. He has a duty to possess and to use that degree of skill, competence, and learning ordinarily possessed and used by others in the same profession, under like and similar circumstances. An attorney who fails to perform his duties for his client is negligent. He is *liable for damages proximately caused to the client thereby*. Restatement (Second) of Torts Sec. 299 A (1965); Prosser, Law of Torts, Sec. 32 (4th Ed. 1971).

Id. at 43 (emphasis added).

On rehearing, the court remanded the cause to the trial court to allow the plaintiff the opportunity for a jury to determine whether the attorney should be liable for malpractice. The court agreed that an attorney may not be held liable for "the choice of trial tactics and the conduct of a case based on professional judgment...," but held that an attorney is "still bound to exercise a reasonable degree of skill and care in all his professional undertakings." 616 F.2d at 930.

While the majority of the court, after rehearing *Woodruff*, held that the plaintiff might be able to show malpractice under the facts of that case, the court still referred to the need of the plaintiff to show

injury or damages. The court quoted cases which would hold the attorney liable of malpractice for "*loss* to (his) client," (616 F.2d at 929, emphasis added), and cited *Bruce v. Baxter*, 75 Tenn. (7 Lea) 477, as follows: "... and if any *injury* result to the client from want of such reasonable care and skill, the attorney must respond *to the extent of the injury sustained*." 616 F.2d at 930, emphasis added.

The above is in harmony with an earlier decision given by the Supreme Court of the United States. That case was *National Savings Bank of D. C. v. Ward*, 100 U.S. 195 at 198, 25 L.Ed. 621 (1880). There the Supreme Court said:

> When a person adopts the legal profession, and assumes to exercise its duties in behalf of another for hire, he must be understood as promising to employ a reasonable degree of care and skill in the performance of such duties; and if injury results to the client from a want of such degree of reasonable care and skill, the attorney *may be held to respond in damages to the extent of the injury sustained* ... but it must not be understood that an attorney is liable for every mistake that may occur in practice, or that he may be held responsible to his client for every error of judgment in the conduct of his client's cause. Instead of that,· the rule is that if he acts with a proper degree of skill, and with reasonable care and to the best of his knowledge, he will not be held responsible.

Id. at 198 (emphasis added).

 The appellant would have us declare that any misconduct of an attorney automatically brings about forfeiture of attorney's fees, whether the misconduct was intended or not, whether it involved a refusal to follow the dictates of the client, right or wrong, and whether damages resulted to the client or not. This is contrary to the law. Even the cases cited by appellant in Mrs. Bloom's brief establish this. See, for example, *In re Thomasson's Estate*, 355 Mo. 274, 196 S.W.2d 155 (Mo.1946), wherein the Missouri court opined that if an

attorney so negligently acts in the conducting of litigation that his client's cause is jeopardized, he should not be allowed to recover fees. The court clarified that statement by holding that an attorney should not be denied compensation if he is merely guilty of negligence which did not affect the interests of his client. The court said that the client could withhold fees from an attorney only if the attorney was guilty of "fraud against his client or the courts". 196 S.W.2d at 162.

Another case cited by counsel for Mrs. Bloom from North Dakota is *Rolstad, Winkjer, Suess, McKennett and Kaiser v. Hanson*, 221 N.W.2d 734 (N.D.1974). The North Dakota court stated that the client may recover loss resulting from an attorney's failure to exercise the care, skill and diligence commonly exercised by reasonable and prudent lawyers within the state. The court further held that the attorney may also be liable to his client, and compensation withheld, if the attorney represents clients with adverse interests. Id. at 737.

 The cases cited speak of denial of compensation only when the attorney's conduct has resulted in loss or damage to the client or when the attorney is representing clients with actual existing conflicts of interest. In the latter case the attorney's compensation may be withheld even where no damages are shown. See *Rolstad*, supra; *American Canadian Oil & Drilling Corp. v. Alridge and Stroud, Inc.*, 237 Ark. 407, 373 S.W.2d 148 (1963). In the present case it is not alleged nor is it proven that Frank represented clients with conflicting interests. Nor is there evidence that Mrs. Bloom was damaged or that she suffered loss from any alleged misconduct of Frank. The necessity for proof of claim such as here asserted is shown by this court's decision in *Christopherson v. Humphrey*, 366 F.2d 323 (10th Cir. 1966). We there held that the trial court may direct a verdict, and in doing so deprive a party from presenting evidence to the jury, when it views the evidence in the light most favorable to the opposing party and finds that the evidence points all one way and is susceptible to no

reasonable inferences which sustain the position of the party against whom the motion is made. In this case reasonable men could not draw different inferences from the evidence presented in support of the contention that there was misconduct. There was no evidence that Mrs. Bloom was damaged by Frank's alleged misconduct sufficient to withhold compensation from the attorney. There was no credible evidence to show that Frank did not perform the services according to accepted professional practices, and it was not shown that Frank was not exercising good faith judgment on Mrs. Bloom's behalf. At the most, or worst, the evidence disclosed vague assertions suggesting that Frank acted contrary to the client's wishes, or that Mrs. Bloom objected to certain of Frank's conduct. Clearly the trial court is entitled to determine that such evidence is insufficient in withdrawing claims or directing a verdict.

Inasmuch as reasonable men could not draw different inferences and reach different conclusions as to whether Mr. Frank's conduct produced injury or loss, the trial court acted well within its power in withdrawing that issue from the jury's consideration. We must thus reject the argument on Mrs. Bloom's behalf.

### Plaintiff–Appellee Frank's Cross Appeal for Prejudgment Interest

Frank's contention is that he is entitled to six percent interest per annum from January 31, 1974 to the date of judgment (on the verdict of $85,000).

 The general rule in Kansas is that prejudgment interest is allowable on liquidated claims, where both the amount due and, in addition, the due dates are fixed and certain. No interest is allowed on unliquidated claims. Frank contends, however, that the $48,000 of his claim which was fixed by the court in the widow's case was liquidated, and at least on that he is entitled to interest. We agree with the appellant that there is no way to tell for certain that the $48,000 awarded to Frank by the Kansas court was part of his fee awarded by the jury. After all, the jury

did not attempt to apportion the award to any particular endeavor of Frank. Also it is to be remembered that the jury was told that it was not bound by the award of $48,000. Since no part of the award was liquidated prior to judgment, Mr. Frank's claim to prejudgment interest is without merit.

Frank makes an alternative argument. This contention is that courts may exercise discretion to award interest on unliquidated damages. *Lightcap v. Mobil Oil Corp.*, 221 Kan. 448, 562 P.2d 1, Kan.Sup.Ct. (1977), cert. denied 434 U.S. 876, 98 S.Ct. 228, 54 L.Ed.2d 156; reh. denied 440 U.S. 931, 99 S.Ct. 1272, 59 L.Ed.2d 489 (1979), quoting 22 Am.Jur.2d, Damages, Sec. 185. We perceive no need to add to the jury's award in order to render Mr. Frank's compensation "fair". To the contrary, we feel that the jury's award more than adequately compensated Mr. Frank for his efforts. Additionally, the evidence shows that Mr. Frank was, himself, responsible for many delays between the time this case was filed and the time of trial, and thus is certainly not entitled to prejudgment interest on the grounds of delay.

The judgment of the district court is affirmed on both the appeal and the cross appeal.