ENRIQUE NASSAR RIZEK, demandante y recurrido, *v.* SALVADOR OSCAR HERNÁNDEZ, ETC., demandados y recurrentes.

*Número:* RE-87-209 *Resuelto:* 7 de marzo de 1989

362

*Michel J. Godreau, Manuel E. Moraza Choisne* y *Petra Mercedes Rodríguez Torres*, abogados de los recurrentes; *Neftalí Cruz Pérez*, de *Rivera, Tulla & Ferrer*, abogado del recurrido.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

El siguiente pensamiento refleja los delicados valores a ser adjudicados en el presente recurso.

*Derecho y Moral no pueden vivir en un desconocimiento disgregante; ambos atienden a la valoración de las acciones humanas no sólo en su relación de alteridad sino sopesando, a la vez, ese fuego íntimo que las alienta, consciencia y voluntariedad, y que yace en las articulaciones psíquicas de cada decisión del hombre.* Sólo una preponderancia estimativa les diferencia, al cargar uno y otra el acento en la afección social del obrar humano o en su proyección hacia el postrer destino del autor que lo genera. *El Derecho ha de hundir sus raíces en el vasto campo de la Moral, fertilizadora y alum-*

*bradora de todas sus realizaciones, en evitación de que se torne árido e infructífero, o lo que es peor, que, partiendo de sus esquemas conceptuales y merced a una hábil desfiguración de fines, se le envilezca en sus proyecciones prácticas.* El Derecho puro, desconectado en su concepción y en su plasmación de los sempiternos principios de la moral, queda, por deshumanizado, reducido a un esquema de lógica formal falto del pálpito vital que le justifica y enaltece. F. Soto Nieto, *Compromiso de Justicia,* Madrid, Ed. Montecorvo, 1977, pág. 197.

## I

En febrero de 1978, la Sra. Elba Vega contrató los servicios del Lic. Rubén O. Figueroa, a la sazón socio del abogado Enrique Nassar Rizek (*Figueroa & Nassar*). Dicha representación legal consistió primordialmente en encomendarle intervenir y defender los derechos que ella entendía, como viuda del Sr. Edward J. Sánchez, le correspondían en la declaratoria de herederos de dicho causante ante el Tribunal Superior, Sala de San Juan (CS-78-856). En esa acción, la primera esposa del difunto reclamaba ser la única y legítima viuda. Según los términos verbales acordados entre la Señora Vega y el licenciado Figueroa, los honorarios por servicios profesionales serían a razón de $40 por hora, pagaderos treinta (30) días después de su facturación. La señora Vega aceptó sin objeción dichos términos. En esa etapa, Salvador Oscar Hernández, actual esposo de la señora Vega, no fue parte de dicho acuerdo ni tuvo relación alguna con el mencionado pleito.

Como resultado de ese litigio, los honorarios adeudados por la señora Vega fueron acumulándose. *Figueroa & Nassar* gestionó cobrar, *en varias ocasiones y por escrito,* dicha suma. En la alternativa, le ofreció un plan de pago a la señora Vega. Estas gestiones, que fueron *muchas, resultaron infructuosas.* Ello motivó eventualmente a que el licenciado Nassar Rizek —quien había cesado de ejercer la profesión en sociedad con el licenciado Figueroa— notificara por carta

el 1ro de noviembre de 1983 a la señora Vega de sus intenciones de renunciar a la representación profesional de ésta.

Ante esa posibilidad, ella y su actual esposo Oscar Hernández se reunieron con el licenciado Nassar Rizek para llegar a un acuerdo favorable a todos. Con vista a una posible renuncia del abogado, los esposos Hernández-Vega trajeron a colación y le ofrecieron como garantía de pago de las cantidades adeudadas por servicios profesionales prestados un solar propiedad privativa de Hernández. A tal efecto, el 18 de noviembre suscribieron un pagaré al portador garantizado con hipoteca por escritura pública sobre dicha propiedad por la suma de $10,654, a vencer al año, más intereses a razón del nueve por ciento (9%) anual y $1,065 en concepto de honorarios y gastos judiciales en caso de ejecución. El tiempo de vencimiento sería prorrogado por seis (6) meses, de satisfacerse antes del año la mitad de lo adeudado. Coetáneamente suscribieron un "Acuerdo de Pago", donde reconocían adeudarle al licenciado Nassar Rizek dicha suma y también se obligaban a pagarle según los términos del pagaré. Además, pactaron que los honorarios futuros —a ser facturados los días 20 de cada mes— serían satisfechos dentro de los treinta (30) días subsiguientes. Estos documentos que anteceden los firmaron los esposos Hernández-Vega, según el foro de instancia, voluntariamente, libres de coacción y con pleno conocimiento de sus términos.

El 18 de noviembre de 1984 venció el plazo para el cumplimiento de esta obligación. El 23 de agosto de 1985, el licenciado Nassar Rizek, a petición de los esposos Hernández-Vega, renunció a su representación profesional y les entregó voluntariamente el expediente del caso. A dicha fecha, los esposos Hernández-Vega habían efectuado ya algunos pagos y la cantidad principal estaba reducida a $8,526.38.

Finalizada la relación profesional, el licenciado Nassar Rizek reclamó sin éxito el pago de ese balance extrajudicialmente. El 20 de diciembre de 1985, optó por demandarlos en

ejecución de hipoteca por la vía ordinaria ante el Tribunal Superior, Sala de Bayamón. Los esposos Hernández-Vega contestaron. Admitieron el otorgamiento del pagaré y escritura, pero negaron la existencia de la deuda. Como defensas afirmativas, adujeron que los acuerdos efectuados eran nulos por ser contrarios al orden público y estar reñidos con los cánones de ética profesional. Expusieron que la propiedad hipotecada rebasaba en valor actual los honorarios adeudados. Formularon reconvención —subsiguientemente enmendada— apuntalada en una supuesta impericia profesional forense y reclamaron un total de $20,000 por pagos indebidos y angustias mentales. El licenciado Nassar Rizek negó toda responsabilidad.

Trabada así la controversia, las partes presentaron ante el tribunal sendas mociones de sentencia sumaria. Oportunamente el ilustrado foro dictó sentencia sumaria parcial en favor del demandante Nassar Rizek y ordenó la venta en pública subasta del inmueble que garantizaba con hipoteca el pagaré al portador. Pospuso toda adjudicación en cuanto a la reconvención.

■ Inconformes, los esposos Hernández-Vega acudieron ante nos. Sus señalamientos pueden compendiarse como un ataque a la procedencia de la sentencia sumaria, a la validez del convenio de pago para garantizar los honorarios acordados hasta ese momento, una vez iniciada la relación profesional,(1) y a la ejecución inmediata de la sentencia antes de dilucidarse la reconvención en los méritos.

---

(1) El señalamiento de los recurrentes de que el otorgamiento del pagaré garantizado con hipoteca no es más que una variante del derecho de retención o gravamen del abogado (*attorney's lien*) es improcedente.

Reafirmamos que en nuestra jurisdicción no existe derecho alguno de abogado de retención de "los documentos y papeles del cliente, como tampoco existe un gravamen . . . sobre el producto de una sentencia obtenida, *Cornier* v. *Tribunal Superior*, 96 D.P.R. 253, 255 (1968), aun cuando medien controversias respecto a determinados honorarios". *In re Vélez*, 103 D.P.R. 590, 599 (1975). En el

## II

En rigor jurídico-científico, el contrato de asistencia profesional de abogado no es más que una variante del contrato de arrendamiento de servicios plasmado en el Art. 1434 del Código Civil, 31 L.P.R.A. sec. 4013. Según la perspectiva clásica, los tratadistas lo incluyen particularmente dentro de los contratos de prestación de servicios propios de las profesiones y de las artes liberales. J. Castán Tobeñas, *Derecho Civil español, común y foral*, Madrid, Ed. Reus, 1985, T. 4, pág. 466; J. Puig Brutau, *Fundamentos de Derecho Civil*, Barcelona, Ed. Bosch, 1982, T. II, Vol. 2, pág. 430; M. Albaladejo, *Comentarios al Código Civil y compilaciones forales*, Madrid, Ed. Rev. Der. Privado, 1986, T. XX, Vol. 2, pág. 1 *et seq.*; M. Albaladejo, *Derecho Civil*, Barcelona, Ed. Bosch, 1983, T. II, Vol. 1, pág. 281. De acuerdo con esta visión, el arrendamiento de servicios de una profesión liberal es aquel donde un profesional pone a disposición de la persona una actividad intelectual o técnica retribuida. Su característica principal es la forma autónoma e independiente en que el profesional, poseedor del título habilitante, la ejerce. Albaladejo, *Comentarios al Código Civil y compilaciones forales, op. cit.*, pág. 27.

Ahora bien, dicho contrato de servicios profesionales de abogado se distingue marcadamente de cualquier otro convenio de arrendamiento de servicios. Este se considera de naturaleza sui géneris. La relación entre abogado y cliente responde en gran medida a las inexorables exigencias éticas, muy particulares de esta profesión. *López de Victoria*

---

contexto notarial, véase *In re Feliciano*, 115 D.P.R. 172, 175 (1984). Sin embargo, en el caso de autos, el licenciado Nassar Rizek no retuvo documento o bienes producto de algún decreto judicial. Según lo indicado, al renunciar a la representación profesional procedió inmediatamente a entregarle a los esposos Hernández-Vega el expediente del caso.

*v. Rodríguez*, 113 D.P.R. 265, 268 (1982). El contrato se encuentra inmerso en normas deontológicas. Éstas impregnan la relación contractual en abono de un interés público superior que puede trascender el interés exclusivo de las partes. Como observa acertadamente Adolfo E. Parry, las leyes reglamentarias de la profesión de abogado "participan del carácter de las de orden público, desde que reposan en concepciones consideradas por el Legislador como esenciales a la existencia de la sociedad: garantizar . . . la competencia y probidad de un servicio público auxiliar de la administración de la justicia". *Ética de la Abogacía*, Buenos Aires, Ed. Jurídica Argentina, 1940, T. 1, pág. 16.

█ Estos valores éticos, atados irremisiblemente a la relación profesional del abogado y por ende a la configuración del contrato, operan como elementos limitantes a la voluntad de los contratantes. En este sentido, queda cualificado el principio de libertad y autonomía de las partes consagrado en el Art. 1207 del Código Civil, 31 L.P.R.A. sec. 3372, respecto de que éstas puedan realizar cualquier convenio siempre y cuando sea conforme a la ley, a la moral y al orden público.

█ En el contexto de la relación abogado-cliente, el aspecto moral que restringe la libertad de contratación es un poco más sensitivo y abarcador. Ello se debe primordialmente a que el ejercicio de la profesión forense supone "una serie de comportamientos inspirados en el cálido sentido de humanidad, de comprensión, de solidaridad social, que comprende todos los valores del espíritu". C. Lega, *Deontología de la Profesión de Abogado*, Madrid, Ed. Civitas, 1976, pág. 37.

█ Esta serie de comportamientos particulares existe en cualquier etapa de la relación abogado-cliente y por su naturaleza se extiende a la fijación de los honorarios. El Ca-

non 24 del Código de Ética Profesional, en lo pertinente, dispone:

> *La fijación de honorarios profesionales debe regirse siempre por el principio de que nuestra profesión es una parte integrante de la administración de la justicia y no un mero negocio con fines de lucro.* Al fijar el valor de los honorarios, deben considerarse los siguientes factores: (1) el tiempo y trabajo requeridos, la novedad y dificultad de las cuestiones envueltas y la habilidad que requiere conducir propiamente el caso; (2) si el aceptar la representación del caso en cuestión ha de impedir al abogado que se haga cargo de otros casos que probablemente han de surgir del mismo asunto, y en los cuales existe una razonable expectativa de que de lo contrario sus servicios serán solicitados o que tal representación implique la pérdida de otros asuntos extraños al caso en cuestión o el antagonismo con otros clientes; (3) los honorarios que acostumbradamente se cobran en el distrito judicial por servicios similares; (4) la cuantía envuelta en el litigio y los beneficios que ha de derivar el cliente de los servicios del abogado; (5) la contingencia o certeza de la compensación; y (6) la naturaleza de la gestión profesional, si es puramente casual o para un cliente constante.
>
> *Es deseable que se llegue a un acuerdo sobre los honorarios a ser cobrados por el abogado al inicio de la relación profesional y que dicho acuerdo sea reducido a escrito.* 4 L.P.R.A. Ap. IX.

El texto de este canon no es enigmático. Aspira, *inter alia*, mediante la estipulación por escrito sobre los honorarios que percibirá el abogado al comienzo de la relación profesional, a reducir las probabilidades de "malas interpretaciones que luego caus[en] fricci[ones] entre abogado y cliente". *In re Díaz Lamoutte*, 106 D.P.R. 450, 455 (1977). Requiere del letrado una escrupulosa cautela en la redacción del documento. Los términos y cláusulas del contrato deben ser lo más claro y preciso posible. *Colón v. All Amer. Life & Cas. Co.*, 110 D.P.R. 772, 774 (1981).

A pesar de que el Canon 24 del Código de Ética Profesional, *supra*, se apuntala sobre el concepto de deseabilidad respecto de que el pacto se realice por escrito —*Ramírez, Segal & Látimer v. Rojo Rigual*, 123 D.P.R. 161 (1989)— el acuerdo verbal también es válido, Art. 1044 del Código Civil, 31 L.P.R.A. sec. 2994. No existe disposición alguna en nuestro ordenamiento jurídico que requiera la forma escrita en el contrato de servicios profesionales de abogado como prerequisito para su validez.

Sin embargo, al respecto, cabe reproducir las atinadas reflexiones de Francisco Lucas Fernández:

> ... [L]a tendencia cada vez más generalizada a la exigencia de responsabilidades a los profesionales por consecu[en]cias derivadas de su actuación (u omisión), el cost[o] aparentemente elevado de los honorarios y la crisis económica y moral ha hecho qu[e m]uchos profesionales tomen sus precauciones documentales probatorias para defenderse de un futuro posible ataque por el cliente. No siempre se contempla el aspecto económico, con ser importante. Las más de las veces se trata de poner a salvo el prestigio profesional. Y es por eso que ante las consecuencias perjudiciales previsibles que puede acarrear el acto o la actuación profesional, primero se le advierte de ello al cliente, y ante su insistencia de seguir adelante no obstante el posible riesgo, se condiciona la continuación o el comienzo de la actividad a la previa firma por el cliente o por su representante del oportuno documento generalmente privado en donde se deja constancia de tales advertencias, del requerimiento del cliente, y de la exención de responsabilidad.
>
> Otras veces, *las menos, se mira al aseguramiento de la retribución ante la eventual posición del cliente que en tiempo ulterior niega haber dado su consentimiento a la prestación del servicio profesional. O aun sin ello no cumplen con su deber de pagar, de lo que tienen amarga experiencia la mayor parte de los profesionales. Con el objeto de facilitar la prueba del contrato se acude a la formalización escrita al menos de la petición de prestación del servicio.* Y cuando la índole de este o el modo de realizarse lo permita, se le exige o el pago anticipado (como ocurre en ciertas consultas médicas) o una

provisión de fondos para ir atendiendo al pago no sólo de los honorarios, sino de los gastos que la prestación del servicio origina, como ocurre en ciertos bufetes de abogados. (Énfasis suplido.) Albaladejo, *Comentarios al Código Civil y compilaciones forales, op. cit.*, págs. 40–41.

Lo expuesto tiene como contraparte el derecho del abogado a recibir como profesional una compensación razonable por sus servicios.(2) Canon 25 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX. Como corolario, el abogado está facultado a entablar aquellas reclamaciones judiciales necesarias para el cobro de sus honorarios, aunque cautelarmente, el mismo canon señala que "deben evitarse", a no ser que se presenten únicamente para impedir injusticias, imposiciones o fraude. *Colón v. All Amer. Life & Cas. Co.*, supra, pág. 774; *In re Santos Vías*, 122 D.P.R. 881 (1988).

En resumen, según nuestro estado de derecho vigente no existe limitación alguna en relación con la especie del contrato que las partes acuerden como método para cobrar los honorarios por servicios justamente rendidos.(3) La única salvedad existente es en torno de la prohibición de adquirir interés o participación alguna en el asunto en litigio encomendádole.(4) Canon 23 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX; *In re Sánchez Ferreri*, 115 D.P.R. 40

---

(2) Entre las decisiones relacionadas más importantes de la jurisprudencia norteamericana, véanse: *Greenbaum & Browne, LTD. v. Braun*, 410 N.E.2d 303 (1980); *Slater v. Jacobs*, 371 N.E.2d 1054 (1977); *Neville v. Davinroy*, 355 N.E.2d 86 (1976); *State v. Nelson*, 279 N.W.2d 1 (1979); *In re Estate of Bort*, 221 N.E.2d 24 (1966); *Singleton v. Collins*, 161 S.E.2d 246 (1968); *Sullivan v. Fawver*, 206 N.E.2d 492 (1965).

(3) En *Barceló v. Díaz*, 29 D.P.R. 170, 180 (1921), afirmamos "que 'a menos que un acto de un abogado no sea ilegal o criminal puede él por lo general cobrar por prestar cualesquiera servicios que se le haya pedido que preste'".

(4) Por otro lado tenemos que el Art. 156 de la Ley Hipotecaria y del Registro de la Propiedad dispone que "[l]a hipoteca podrá constituirse en garantía de *toda clase de obligaciones* y no alterará la responsabilidad personal del deudor que establece el artículo 1811 del Código Civil vigente." 1979 Leyes de Puerto Rico 672.

(1984); *Colón v. All Amer. Life & Cas. Co.*, supra; *In re Cepeda Parrilla*, 108 D.P.R. 353 (1979).(⁵)

## III

En buena metodología adjudicativa y en obediencia a nuestra tradición civilista debemos auscultar si el acuerdo entre los esposos Hernández-Vega y el abogado Nassar Rizek cumple con los tres (3) elementos cardinales configurativos de un contrato: consentimiento, objeto y causa. Art. 1213 del Código Civil, 31 L.P.R.A. sec. 3391. Ello sin olvidar el carácter e interés público que reviste la profesión de abogado. La tarea, aunque difícil, se facilita aquí por la aceptación de ambas partes, quienes no cuestionan la existencia de los últimos dos (2) requisitos. Por ende, nos limitaremos a examinar los factores determinantes en torno del apercibimiento por parte del abogado Nassar Rizek de cesar su re-

---

(⁵) De esta visión se hace eco la jurisprudencia norteamericana. Sólo exige que el sistema de cobro utilizado sea válido en derecho, moralmente ético y realizado de forma honesta. En suma, que sea de buena fe y justo. *Frank v. Bloom*, 634 F.2d 1245 (10mo Cir. 1980); *Bluestein v. State Bar of California*, 529 P.2d 599 (1975); *Hunt v. Picklesimer*, 162 S.W.2d 27 (1942); *Laspy v. Anderson*, 361 S.W.2d 680 (1962).

Ahora bien, cuando el contrato original otorgado se modifica, o se pacta un nuevo acuerdo durante la litigación del pleito, la percepción cambia significativamente. Existen tres (3) corrientes doctrinarias distintas en la jurisdicción norteamericana: (A) La primera presume el contrato así alterado como uno inválido per se. Este rigor responde al propósito de evitar el fraude. (B) La segunda, más leniente, deja la validez del pacto al solo arbitrio del cliente. Este enfoque parte de la premisa de que la opción de ratificar el acuerdo pendiente brinda al cliente la oportunidad de rechazar el acuerdo fraudulento o aquel que lesione sus intereses. (C) La tercera considera válido el convenio en el supuesto de que éste sea justo, ecuánime y hecho voluntariamente por el cliente con pleno conocimiento de todos los hechos pertinentes al caso. Véase Anotación, *Validity and Effect of Contract for Attorney's Compensation Made after Inception of Attorney-Client Relationship*, 13 A.L.R.3rd 701 (1967).

Entre los diversos factores que pueden afectar la voluntariedad del pacto, se ha entendido que contratos suscritos bajo amenaza de abandono del caso por el abogado en una etapa crucial del litigio son nulos. Se considera que ello representa una "influencia indebida" (*undue influence*) por la condición de indefensión relativa del cliente frente a determinadas circunstancias que vician su consentimiento. Anotación, *supra*, pág. 743.

presentación profesional durante el transcurso del pleito y si éste demostró mediante la solicitud de sentencia sumaria un consentimiento válido de los recurrentes, Hernández-Vega, al otorgar el pagaré.

En *Colón Prieto v. Géigel*, 115 D.P.R. 232, 234 (1984), en argumentos escorados por Carlo Lega, señalamos:

"La relación entre abogado y cliente puede considerarse desde varios puntos de vista. Ante todo desde el jurídico, respecto de los derechos y obligaciones que derivan para las partes del contrato de prestación de obra intelectual. . . . [S]alta a los ojos el carácter personal de la relación profesional, *a causa del contacto humano* que tiene lugar entre las partes y a causa de la naturaleza del objeto del contrato de que se trata. Sabido es que la relación que se establece entre abogado y cliente viene acotada por un carácter personal y fiduciario, así como por el hecho de que el cliente se confía a su patrocinador, debido sobre todo a la consideración que el primero tiene de las dotes de capacidad de trabajo (técnicas y morales) del segundo. . . . *Está claro que de los dos sujetos de la relación profesional el abogado es el que tiene las redes en la mano y quien está destinado a desempeñar una función de arrastre en esta relación intersubjetiva, encontrándose el mismo, al menos en teoría, en posición de relativa superioridad respecto al cliente que, desconocedor de las reglas jurídicas, no conoce el ambiente forense y judicial y sufre por lo general el trauma psíquico del litigio en el que se ve envuelto como actor, como demandado o como acusado.*" (Énfasis suplido.)

Este enfoque pone de manifiesto la fuerza permanente que de ordinario genera el abogado frente a su cliente. Los principios éticos de decoro, dignidad e integridad profesional del abogado prohíben que éste se aproveche de esa posición. Por razón de la misma, ante disputas de índole contractual con los clientes, los tribunales están llamados a revisar cuidadosamente el acuerdo y las circunstancias, y así satisfacer la conciencia judicial y lograr la mayor

aproximación a la verdad y a la justicia. Como consecuencia, aquel contrato que realmente se materialice dentro de un estado de temor —producto de una amenaza de un mal inminente— será considerado nulo en determinadas circunstancias, por ser producto de una intimidación que invalida el consentimiento. Después de todo, con rigor conceptual, la intimidación propiamente dicha es una coacción moral. *Calderón v. Vallecillo*, 77 D.P.R. 859, 867 (1955).

 Sin embargo, para que esta coacción vicie el consentimiento y anule el acto volitivo, deberán satisfacerse los requisitos del Art. 1219 del Código Civil, 31 L.P.R.A. sec. 3406. Manresa divide en tres (3) los elementos fundamentales que configuran la intimidación:

a) Que se emplee contra uno de los contratantes la amenaza de un mal inminente y grave, susceptible por ende, *de ejercer seria influencia sobre su ánimo.*

b) Que esta amenaza determine la declaración de voluntad, o lo que es igual, *que exista un nexo causal entre la intimidación y el consentimiento.*

c) Que la repetida amenaza y el influjo que pueda ejercer sobre la voluntad *revistan un matiz antijurídico, por cuanto no quepa reputarlos ilícitos como consecuencia de una correcta y no abusiva utilización de los derechos.* (Énfasis suplido.) J.M. Manresa, *Comentarios al Código Civil Español*, 6ta ed., Madrid, Ed. Reus, 1967, T. VIII, Vol. 2, pág. 575.

 De acuerdo con dicha configuración, rehusamos a priori establecer —a título de presunción— la regla de que el apercibimiento o amenaza de un abogado de renunciar a una representación por no habérsele satisfecho los honorarios adeudados constituye per se una actuación intimidatoria. Lo contrario implicaría dejar a los abogados a merced de sus representados y a tener que prestar sus servicios sin ninguna remuneración. Después de todo, la amenaza de ejercitar un derecho no es sinónimo de intimidación —*Rodríguez v. M. Joglar & Co., S. en C.*, 46 D.P.R. 350, 353 (1934)— ni

anula la obligación. Art. 1220 del Código Civil, 31 L.P.R.A. sec. 3407. Dependerá de las circunstancias peculiares de cada caso. *Rivera v. Banco Industrial, Etc. y García, Int.*, 49 D.P.R. 709, 723 (1936). Ello no excluye la posibilidad, en la relación abogado-cliente, de que en una etapa crítica de un litigio tal acción pueda dejar de ser legítima y, en atención a las circunstancias concurrentes, constituya una verdadera amenaza o coacción que vicie el consentimiento. La cuestión exige ponderar todos los factores pertinentes, sobre todo el estado de ánimo del intimidado, pues "[l]a persona amenazada, es por su carácter, sexo, condición, edad o profesión capaz de resistir la amenaza, venga de quien viniere, en otras, estas mismas circunstancias al recaer sobre personas *débiles, incultas, inexpertas o desamparadas hacen presumible la coacción, máxime si quienes la ejercen aparecen, en su calidad y condiciones, en situación de llevarla a cabo con ventaja, por lo cual la apreciación de esta modalidad de fuerza intimativa no puede constituirse a modo de criterio general*, sino de específica consideración de *cada supuesto*". (Énfasis suplido.) Manresa, *op. cit.*, pág. 577.

Rechazamos, pues, el planteamiento de los recurrentes de que "el contrato partiendo del cual se otorgaron el pagaré y la escritura de constitución de hipoteca que se pretende ejercitar a través de la demanda radicada es nulo por ser contrario al Orden Público". Véase Solicitud de revisión del recurrente, pág. 17 *et seq.*

## IV

De acuerdo con este orden doctrinario, no erró el ilustrado tribunal de instancia al concluir *sumariamente* la validez del pagaré garantizado con hipoteca.

■ Un análisis integral de la deposición tomada a Oscar Hernández, en que se fundamentó principalmente dicho decreto, refleja incuestionablemente que éste admitió que

había leído y firmado voluntariamente tales documentos. También, que prestó su consentimiento al otorgarlos libre y espontáneamente. Su decisión no fue impensada ni irreflexiva. Fue con pleno conocimiento de causa, después de las múltiples gestiones previas entre los abogados de cobrar válidamente sus honorarios. Todas las circunstancias expuestas hacían viable la concesión de una sentencia sumaria. *Rivera Encarnación v. E.L.A.*, 113 D.P.R. 383, 386–387 (1982); *Padín v. Rossi*, 100 D.P.R. 259, 263 (1971). Como recientemente indicáramos en *Corp. Presiding Bishop CJC of LDS v. Purcell*, 117 D.P.R. 714, 720 (1986), este mecanismo "tiene como propósito aligerar la tramitación de un caso permitiendo que se dicte sentencia sin necesidad de que se tenga que celebrar la vista en los méritos, cuando de los documentos no controvertidos que se acompañan con la solicitud *surge que 'no existe una legítima disputa de hecho a ser dirimida, [. . .] sólo resta aplicar el derecho'*". Procesalmente, la cuestión no ameritaba dilucidarla en un juicio plenario.

## V

Ahora bien, aunque el foro de instancia actuó correctamente en cuanto de la validez de la deuda y pagaré hipotecario, incidió al ordenar su inmediata ejecución.

Nassar Rizek no es un tercero tenedor del pagaré al portador. Por el contrario, es el abogado a quien le fue expedida dicha obligación en consideración de sus servicios profesionales. Como tenedor original, le aplican todas las defensas que los deudores Oscar Hernández *et al.* puedan levantar, incluso la configurada en la reconvención sobre ale-

gada "impericia profesional". Esta causa de acción está inextricablemente unida a la acción en ejecución hipotecaria, cuya génesis *no es otra cosa que el cobro de los honorarios.* Esta sola razón, aparte de consideraciones procesales y de justicia, es suficiente para paralizar, en este respecto, la ejecución. La misma deberá suspenderse hasta que se haya ventilado y resuelto la reconvención.

*Se dictará la correspondiente sentencia modificatoria.*

El Juez Asociado Señor Ortiz no intervino. La Juez Asociada Señora Naveira de Rodón y el Juez Asociado Señor Alonso Alonso concurren con el resultado sin opinión escrita.